# Exhibit A

Ari S. Friedman, Esq. (State Bar No. 256463)
Elizabeth M. Loranger, Esq. (State Bar No. 356455)
Michael L. Baum, Esq. (State Bar No. 119511)
**WISNER BAUM, LLP**
11111 Santa Monica Boulevard, Suite 1750
Los Angeles, CA 90025
Tel.: (310) 207-3233
Fax: (310) 820-7444
afriedman@wisnerbaum.com
mbaum@wisnerbaum.com
aloranger@wisnerbaum.com

*Attorneys for Plaintiff*

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/04/2026 2:44 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE (Rule 3.550) | JCCP No. 4872 |
| **JOHNSON & JOHNSON TALCUM POWDER CASES** | CASE NO. ___26STCV04029___ |
| | **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL** |
| HELEN JEAN PARKER, an Individual | 1. **NEGLIGENCE** |
| Plaintiff, | 2. **NEGLIGENT FAILURE TO WARN** |
| v. | 3. **STRICT LIABILITY - DESIGN DEFECT** |
| JOHNSON & JOHNSON, a New Jersey corporation doing business in California; | 4. **STRICT LIABILITY – FAILURE TO WARN** |
| KENVUE INC., a Delaware corporation doing business in California individually and as successor-in-interest to Old Johnson & Johnson Consumer Inc. and New Johnson & Johnson Consumer Inc.; | 5. **BREACH OF WARRANTY** 6. **FRAUD – INTENTIONAL MISREPRESENTATION** 7. **FRAUD – CONCEALMENT** 8. **NEGLIGENT MISREPRESENTATION** |
| RED RIVER TALC LLC; a Texas limited liability company, individually and as successor-in-interest to LLT Management LLC and Old Johnson & Johnson Consumer Inc.; | |
| JOHN DOE CORPORATIONS 1 through 100, inclusive; | |
| Defendants. | |

Plaintiff HELEN JEAN PARKER, an Individual, herein after ("Plaintiff"), by and through counsel, for causes of action against the Defendants, alleges as follows:

**PARTIES**

1.      Plaintiff is a competent individual, over the age of 18, and a citizen of the United States.

2.      Plaintiff brings this action in accordance with California Code of Civil Procedure section 378, as Plaintiff's claims arise out of the same transaction, occurrence, or series of transactions or occurrences, and questions of law and fact common to all of the other plaintiffs that were or may be joined in this case will arise in the action.  All claims in this action are a direct and proximate result of the negligent, willful, and wrongful acts and/or omissions of Defendants and/or their corporate predecessors and successors in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the products by JOHNSON & JOHNSON, JOHNSON & JOHNSON CONSUMER INC. f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC., LLT MANAGEMENT LLC, RED RIVER TALC LLC, and KENVUE, Inc. known as Johnson & Johnson Baby Powder and Shower to Shower (hereinafter "the PRODUCTS"), and the talcum powder product which was mined, extracted, sorted, milled, treated, formulated, processed, packaged, sold, and shipped by IMERYS TALC AMERICA, INC. to JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. f/k/a JOHNSON & JOHNSON CONSUMER COMPANIES, INC. for use in the PRODUCTS and for sale to the public.  Plaintiff in this action seeks recovery for damages as a result of ovarian and/or fallopian tube cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of talcum powder, and the attendant effects of developing ovarian and/or fallopian tube cancer. All of the claims in this action involve common legal, factual, and medical issues.

3.      Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant JOHNSON & JOHNSON was and is a corporation doing business in and authorized to do business in the state of California, and was incorporated in New Jersey in 1887.

4.      Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant JOHNSON & JOHNSON maintains an office located at One Johnson & Johnson Plaza, New

Brunswick, New Jersey, 08933 as well as several locations within the state of California, and has approximately 127,100 employees worldwide.

5. As stated in JOHNSON & JOHNSON'S Form10-K Annual Report Pursuant to Section 13 of the Securities Exchange Act of 1934 for the fiscal year ended January 3, 2016, JOHNSON & JOHNSON'S primary focus is on products related to human health and well-being.

6. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant JOHNSON & JOHNSON'S family of companies includes more than 250 operating companies conducting business in 60 countries throughout the world and organized into three business segments: Consumer, Pharmaceutical, and Medical Devices.

7. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the JOHNSON & JOHNSON family of companies includes 121 manufacturing facilities, and, within the United States, eight facilities are used by the Consumer segment. In addition to the manufacturing facilities, JOHNSON & JOHNSON maintains numerous offices and warehouses in the United States.

8. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the Consumer segment of the JOHNSON & JOHNSON family of companies includes a broad range of over-the-counter products including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder. These products are marketed to the general public and sold both to retail outlets and distributors throughout the world.

9. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendant JOHNSON & JOHNSON ("J&J") has engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions of dollars in products to Californians including, but not limited to, Shower to Shower body powder and Johnson & Johnson's Baby Powder, that said activity by Defendant is substantially connected to the Plaintiff's claims as alleged herein.

10. Defendant KENVUE, INC. ("KENVUE"), individually and as successor-in-interest to Old JJCI and New JJCI, is a Delaware corporation, doing business in the state of California, and engaged in substantial, continuous economic activity in California, including marketing, distribution, and sale of billions dollars in products to Californians including, but not limited to, Shower to Shower body powder

and Johnson & Johnson's Baby Powder, that said activity by Defendant is substantially connected to the Plaintiff's claims as alleged herein.

11.     At all relevant times, upon information and belief, Defendant KENVUE, Inc. or its predecessors, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the talcum powder products, including but not limited to Shower to Shower body powder and Johnson's Baby Powder.

12.     In its initial SEC filing, KENVUE, INC. stated that "[i]t is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." KENVUE, INC. further stated that it "may be subject to additional claims… related to the sale of talc-based Johnson's Baby Powder in markets where we have discontinued this product (such as in the United States and Canada), including potential governmental inquires, investigations, claims and consumer protection cases from state attorneys general."

13.     Defendant RED RIVER TALC LLC ("RED RIVER"), individually and as successor-in-interest to Old JJCI and LLT Management LLC, is a Texas limited liability company. At all relevant times, upon information and belief, RED RIVER TALC LLC, or its predecessor, was engaged in the business of manufacturing, formulating, marketing, testing, promoting, selling, and/or distributing the talc products, including but not limited to Shower to Shower and Johnson's Baby Powder. At all relevant times, RED RIVER, or its predecessor, regularly transacted, solicited, and conducted business in California.

14.     At all relevant times, Defendants J&J, RED RIVER, and KENVUE have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the talcum powder products, including but not limited to Shower to Shower and Johnson's Baby Powder.

15.     Defendant RED RIVER is and has been at all relevant times a wholly owned subsidiary of Defendant Johnson & Johnson, under the complete dominion and control of Defendant Johnson & Johnson. Defendant KENVUE is the successor-in-interest to Old Johnson & Johnson Consumer Inc. ("Old JJCI"), which was a wholly owned subsidiary of Defendant Johnson & Johnson, under the complete dominion and control of Defendant Johnson & Johnson. Hereinafter, unless otherwise delineated, RED RIVER,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 8**

KENVUE and J&J together shall be referred to as the "Johnson & Johnson Defendants" or the "J&J Defendants." As used in this Complaint, "Johnson & Johnson Defendants" refers to and means Defendants J&J, KENVUE, and RED RIVER, either or both in its own right or as a corporate successor to an entity or person whose acts, omissions, undertakings, or activities are attributed to it by contract or operation of law.

16.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, IMERYS TALC AMERICA, INC., was and is a Delaware corporation, with its principal place of business in the state of California.  In order to comply with the stay of proceedings in connection the Imerys bankruptcy case filed February 13, 2019, in the United States Bankruptcy Court for the District of Delaware, IMERYS has not been named as a Defendant in this Sixth Amended Master Complaint. However, neither the filing nor the adoption of this Sixth Amended Master Complaint, is intended in any way to act as a dismissal of IMERYS as a Defendant in any individual complaint or Master Complaint previously filed prior to that date by any Plaintiff included in this coordinated proceeding, nor is it intended to abandon or withdraw any claims or allegations made against IMERYS as a Defendant in any such prior Master Complaint or complaint made by any Plaintiff who had filed an action against IMERYS prior to the stay.

17.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, IMERYS TALC AMERICA, INC., is the successor or continuation of Luzenac America, Inc., and IMERYS TALC AMERICA, INC. (hereinafter "IMERYS") is legally responsible for all liabilities incurred when it was known as Luzenac America, Inc.

18.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, IMERYS has been in the business of mining, extracting, processing, treating, formulating, promoting, selling, and distributing talcum powder for use in talcum powder based products, including the PRODUCTS.

19.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, one or more of the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint was and is a California corporation incorporated under the laws of the State of California, and/or has its principal place of business in this State, and was an integral part of the overall producing and marketing enterprise involving the JOHNSON & JOHNSON Defendants' talcum powder products.

20. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, one or more of the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint were and are California corporations incorporated under the laws of the State of California, and/or have their principal places of business in this State, and were in the business of retailing and selling the JOHNSON & JOHNSON Defendants' talcum powder products.

21. Plaintiff is informed and believes, and based thereon alleges that, Plaintiff purchased the JOHNSON & JOHNSON Defendants' talcum powder products from said Other Defendants' stores.

22. Under California law, retail sellers of Johnson & Johnson talcum powder products, are liable in strict liability to purchasers, including Plaintiff, for injuries caused by design defects associated with the products as well as failure to warn of the products' dangerous propensities. (See e.g. *Soto v. Tristar Products, Inc.* (C.D. Cal., Nov. 9, 2017, No. CV176406MWFMRWX) 2017 WL 5197399, at *3 (granting motion to remand) ("[U]nder California law, the doctrine of strict products liability extends "to retailers because retailers 'are an integral part of the overall producing and marketing enterprise that should bear the cost of injuries resulting from defective products ...' " *Ontiveros v. 24 Hour Fitness Corp.*, 169 Cal. App. 4th 424, 431, 86 Cal. Rptr. 3d 767 (2008) (quoting *Vandermark v. Ford Motor Co.* 61 Cal. 2d 256, 262, 37 Cal. Rptr. 896 (1964)). "*Vandermark* explained that holding retailers strictly liable would (1) enhance product safety since retailers are in a position to exert pressure on manufacturers; (2) increase the opportunity for an injured consumer to recover since the retailer may be the only entity 'reasonably available' to the consumer; and (3) ensure fair apportionment of risks since retailers may 'adjust the costs of such protection between them in the course of their continuing business relationship.' " *Id.* (quoting *Vandermark*, 61 Cal. 2d at 262-63).") ; *McCarty v. Johnson & Johnson* (E.D. Cal., June 29, 2010) 2010 WL 2629913, at *3 (granting motion to remand) ("A distributor can be held strictly liable for products sold. *Vandermark v. Ford Moter Co.,* 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 391 P.2d 168 (1964). In *Vandermark* the court held that a retailer could held liable as a distributor under stream of commerce strict liability. *Id.* The court reasoned that the policy concerns for manufacturers applied to retailers. *Id.* "The courts have since applied the doctrine to others similarly involved in the vertical distribution of consumer goods, including lessors of personal property, developers of mass-produced homes, wholesale and retail distributors, and licensors." *Bay Summit Community Ass'n v. Shell Oil Co.,* 51

5
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 10**

Cal.App.4th 762, 773, …"); *Dodich v. Pfizer Inc.* (N.D. Cal., July 26, 2018, No. C 18-02764 WHA) 2018 WL 3584484, at *3 (granting motion to remand) ("[I]n California, distributors can also be liable for design-defect and failure-to-warn strict product liability. *Vandermark*, 61 Cal. 2d at 262–63. This order finds no California state court decision since *Vandermark* that says otherwise."); *Maher v. Novartis Pharmaceuticals Corp.* (S.D. Cal., Aug. 13, 2007, No. 07CV852 WQH (JMA)) 2007 WL 2330713, at *5 (granting motion to remand) ("In the Complaint, Plaintiff alleges that Defendant McKesson distributed, promoted, labeled, and marketed Tegretol to Plaintiff, and that Plaintiff was injured when she used Tegretol. Plaintiff further alleges that Defendant McKesson knew that Tegretol was dangerous, yet failed to warn physicians and patients of the drug's dangerous propensities. The Court concludes that it is not "obvious" that Plaintiff has failed to state a claim against Defendant McKesson under settled California law, *McCabe,* 811 F.2d at 1339, and that Defendant Novartis has not met its "heavy burden" to show that McKesson has been fraudulently joined.")

23. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of Defendants Does 1 through 100, inclusive, were unknown to Plaintiff at the time of original filing of the underlying complaint in this action and, therefore sues said Defendants by such fictitious names.

24. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, the true names or capacities, whether individual, corporate, or otherwise, of Defendants Does 1 through 100, inclusive, remain unknown to Plaintiff and, therefore Plaintiff sues said Defendants by such fictitious names. Plaintiff is informed and believes and based thereon alleges that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiff as alleged herein.

25. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all of said Defendants herein, including the named Defendants, Defendants DOES 1 through 100, inclusive, and Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint are collectively referred to herein as "Defendants" and all acts and omissions of Defendants as alleged herein were undertaken by each of the Defendants or said Defendants' agents, servants, employees and/or owners, acting in the course and scope of its respective agencies, services, employments and/or ownerships.

**<u>JURISDICTION</u>**

26.     This action arises out of the actions and conduct of IMERYS and the JOHNSON & JOHNSON Defendants in the State of California and the JOHNSON & JOHNSON Defendants' contacts with the State of California, and there is an affiliation between California and the underlying controversy subject to the State's regulation. Specifically, the J&J Defendants engaged in significant and continuous relevant acts together with IMERYS (aka Luzenac/Rio Tinto), and as a result of the Defendants' activities and conduct within the State of California and the occurrences resulting from Defendants' activities and conduct within this State, harm was caused not only to California residents, but to those who purchased and used the PRODUCTS in other states as well. At all times mentioned, the J&J Defendants were acting as coconspirators, joint-venturers, partners, principals, agents, aiders and abettors of IMERYS, affecting and causing harm to purchasers of their products both in California as well as in other states, thereby rendering them derivatively liable for the conduct of each other which took place in the State of California including, but not limited to, their concerted actions of negligence, fraud, concealment, deceit and misrepresentation.

Furthermore, this Court has jurisdiction over Defendants in this case pursuant to *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) ("*BMS*"), which provides:

> A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State… In order for a state court to exercise specific jurisdiction, "the suit" must "aris[e] out of or relat[e] to the defendant's contacts with the forum." [] In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."

(Internal citations omitted).

27.     In *BMS*, the United States Supreme Court identified several factors which would give rise to personal jurisdiction in actions by non-residents, including (1) evidence that a non-resident manufacturer has "engaged in relevant acts together with" a California resident corporation which caused injury outside of California, and (2) evidence that the non-resident manufacturer is "derivatively liable for" a California resident corporation's conduct in California which injured the plaintiff outside of California. *Id*. at 1776-77.

7

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 12**

  **a.**  ***JOHNSON & JOHNSON's Acts and Occurrences in California Relevant to the Underlying Controversy***

28.  At all pertinent times, JOHNSON & JOHNSON was and continues to be connected to California through their predecessor ownership in California talc mines, mills, and processing plants. JOHNSON & JOHNSON originally sourced raw talcum powder for Johnson's Baby Powder PRODUCTS from domestic mines located in California and continued to operate a talc mining facility in Calaveras County, California until January 6, 1989.

29.  Between 1972 and 1989 JOHNSON & JOHNSON, through its wholly-owned subsidiary Windsor Minerals, Inc. ("Windsor"), owned and operated talc mines located in California and Vermont. During this time period, Windsor's talc operations served as a source of JOHNSON & JOHNSON's talc. *See* IMERYS 344670.

30.  Windsor's California mine was located in Calaveras County, California, (*see* IMERYS 239249; JNJ 000240658) and was controlled by Windsor's wholly-owned subsidiary, Western Source, Inc. ("Western Source"). *See* IMERYS 344571. Western Source was incorporated in California on June 22, 1979. *See* IMERYS 344567; IMERYS 132598.

31.  From 1972 to 1989 JOHNSON & JOHNSON owned all of the issued and outstanding shares of the capital stock of Windsor, and Windsor owned all of the issued and outstanding shares of the capital stock of Western Source. *See* IMERYS 344571; Historical Research and Site Reconnaissance, Former Cyprus Industrial Minerals, SMS site #2010-4124, ECS Project #08-215119 (Feb 2011) at p. 8. Throughout this time period, Windsor and Western Source continued to issue dividends to JOHNSON & JOHNSON, and JOHNSON & JOHNSON retained the right to manage Windsor's business, extending its reach to Western Source. *See* IMERYS 344866. Moreover, Ather Williams, Jr., JOHNSON & JOHNSON's Vice President of Manufacturing/Engineering, served as Director of Western Source and was on the Board of Directors for Windsor. *See* IMERYS 345079.

32.  In the 1980s, five percent of United States talc production was mined in California (*See* JNJ 000240656), and JOHNSON & JOHNSON's California subsidiary, Western Source, was the principal California talc producer. *See* JNJ 000240658. Between 1979 and 1986, the average value of talc sales for all California producers ranged from 1.28 and 6.96 million dollars. *See* JNJ 000240652.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 13**

33.     JOHNSON & JOHNSON sold all rights and interests in Windsor and Western Source to Cyprus Mines Corporation ("Cyprus Mines") for 37.7 million dollars pursuant to a Purchase Agreement dated January 6, 1989. *See* IMERYS 344863.

34.     In the Purchase Agreement, JOHNSON & JOHNSON covenanted that it would cause Windsor and Western Source to perform all obligations agreed to between JOHNSON & JOHNSON and Cyprus Mines, and JOHNSON & JOHNSON assumed sole liability for any representation made or warranty granted by Windsor or Western Source to Cyprus Mines as if JOHNSON & JOHNSON had made such representation or granted such warranty itself:

> 5. Covenants.
>
> **...** 5.2 <u>Windsor and Western Obligations</u>. Prior to the Closing Date, J & J shall cause Windsor and Western to perform the obligations of Windsor and Western hereunder, and shall be solely responsible and liable for each representation made, and each warranty granted, by Windsor and Western, as if J & J had made such representation or granted such warranty itself.

*See* IMERYS 344602.

35.     Pursuant to the Purchase Agreement, JOHNSON & JOHNSON and Cyprus Mines entered into a partnership whereby JOHNSON & JOHNSON gained the right to participate in the development and marketing of new talc products developed by Cyprus Mines. *See* IMERYS 344866.

36.     In order to preserve JOHNSON & JOHNSON's long term and exclusive source for talc, the sale of Windsor from JOHNSON & JOHNSON to Cyprus Mines was made contingent on the execution of a Talc Supply Agreement wherein Windsor and Western agreed to supply, and JOHNSON & JOHNSON agreed to buy, one hundred percent of JOHNSON & JOHNSON's U.S. cosmetic grade talc requirements.

37.     The Talc Supply Agreement was executed on January 6, 1989, under an initial term of ten years with an option to extend the agreement an additional five years, thereby securing JOHNSON & JOHNSON's ability to manufacture and produce the talc PRODUCTS nationwide through December 31, 2003. *See* IMERYS 344624; IMERYS 344670-74; IMERYS 231039.

38.     In 1992 Cyprus Mines transferred its assets associated with its talc business to Cyprus Talc Corporation ("Cyprus Talc Corp."), which was later sold to RTZ America, Inc., a wholly-owned subsidiary of Rio Tinto Group, and renamed Luzenac America, Inc. *See* IMERYS 132589. On August 1, 2011,

9

IMERYS became the world leader in talc processing when it acquired one hundred percent of the Luzenac Group for $340 million dollars.

39. IMERYS is the current owner of Western Source.

**b.** ***Derivative Liability - Defendants' Relevant Acts Together and Knowledge that Talc Powder Violates Proposition 65***

40. Pursuant to *BMS*, 137 S. Ct. at 1776, and *In re Auto. Antitrust Cases I & II*, 135 Cal. App. 4th 100, 117-18 (2005), conspiracy is a recognized basis for acquiring personal jurisdiction.

41. *In re Auto. Antitrust Cases I & II*, 135 Cal. App. 4th at 117-18, provides:

> Typically, the plaintiff need not establish the merits of the complaint in order to prove jurisdiction. (Magnecomp Corp. v. Athene Co. (1989) 209 Cal. App. 3d 526, 533 [257 Cal. Rptr. 278].) However, when personal jurisdiction is asserted on the basis of a nonresident defendant's alleged activities in this state, facts relevant to jurisdiction may also bear on the merits of the case.

42. *In re Auto. Antitrust Cases I & II* further explained that in order to establish jurisdiction over a defendant by way of conspiracy, the plaintiff must "offer some evidence that persuades the trial court that there is reason to believe that each of the named nonresident defendants might be linked to the alleged conspiracy…. This evidence need not be strong or conclusive, nor need plaintiffs prove each element of their causes of action." *Id*. at 119. Ultimately, the court found that a plaintiff need only "provide some evidence allowing the trial court—as finder of fact on jurisdictional issues—to conclude that these particular named defendants were involved in the alleged conspiracy." *Id*.

43. While the *Noerr–Pennington* doctrine shields defendants from liability for their actions in petitioning government officials, "[i]t does not provide a basis for exclusion of *evidence* of lobbying activities that might be relevant to show a defendant's knowledge of the dangerous nature of its product or a failure to exercise ordinary care." *Hernandez v. Amcord, Inc.,* 215 Cal. App. 4th 659, 677-80 (2013) (explaining that "the anti-SLAPP statute does not provide a ground for exclusion of evidence in a products liability action.").

44. This Court has jurisdiction over Defendants as there is a substantial nexus between Defendants' partnered activities in California and their joint venture and conspiracy to conceal the known dangers of talc from Plaintiff, consumers nationwide, regulatory bodies, and watchlist groups, such as the International Agency for Research on Cancer ("IARC"), the California Legislature in relation to

10

Proposition 65, the United States Food and Drug Administration ("FDA"), the National Toxicology Program ("NTP"), the Cosmetic Ingredient Review ("CIR") Expert Panel, and the Public Citizen Health Research Group, and their agreement to aid and abet each other, and provide each other substantial assistance, encouragement and advice in committing the wrongful acts described herein.

45.    At all pertinent times, a key issue facing Defendants' talc nationwide operations was and is the potential categorization of talc as a carcinogen by any of the above regulatory bodies or watchlist groups. Therefore, in order to protect the profitability of their operations, JOHNSON & JOHNSON and IMERYS, and/or their predecessors-in-interest, partnered and conspired with one another to conceal the known dangers of talc from Plaintiff by intentionally misrepresenting and concealing the risks and dangers associated with the use of the talc to regulatory bodies and watchlist groups.

46.    A significant portion of their concerted efforts focused on Proposition 65, a California voter-approved initiative intended to address California's growing concerns about exposure to toxic chemicals. Proposition 65 requires the State to publish a list of chemicals known to cause cancer, birth defects, or other reproductive harm.

47.    Defendants' internal records document their shared concerns regarding Proposition 65 and the "high impact" (*see* IMERYS 001304) that a listing would have on their talc operations not only in California, but nationwide.

i.    An internal memorandum from JOHNSON & JOHNSON captures the nationwide significance of a Proposition 65 listing:

> chemicals identified in the [NTP] Report of Carcinogens may be placed on the Proposition 65 list and influence the labeling of certain products containing such substances nationwide.

*See* JNJ 000019928.

ii.    Board of Director Meeting Notes from the Personal Care Products Council dated December 2, 2010, predicted the detrimental impact of a Proposition 65 listing on Defendants' talc operations and PRODUCTS:

> In the spring of 2008, the agency charged with implementation of Proposition 65, known as the Office of Environmental Health and Hazzard Assessment (OEHHA), issued a notice of intent to augment the Proposition 65 list with certain chemicals under the California Labor Code. These chemicals include, among other things… talc-based body powder…

11
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 16**

… [The California Chamber of Commerce filed a lawsuit] against the State of California in November 2008 alleging that the state lacks the authority to list such chemicals. The court ruled against us [manufacturers and suppliers] in June 2009 and held that the Labor Code chemicals should be automatically added to the Proposition 65 list.

An appeal of the lower court case was filed on November 25, 2009… If we [manufacturers and suppliers] lose on appeal, and OEHHA proceeds with listing chemicals such as … talc-based body powder, all products containing those ingredients would be required to bear a Proposition 65 warning.

The importance of the Labor Code Lawsuit has amplified in light of California's recently released proposed *Green Chemistry* regulations. If we [manufacturers and suppliers] lose on appeal, and the Labor Code chemicals are added to the Prop 65 list, they will automatically be regulated under the proposed Green Chemistry regulations as priority chemicals and subject to onerous reporting and testing requirements. Many of them may be ultimately restricted or banned altogether from use in consumer products.

*See* JNJTALC000441301.

48.     Internal emails from Richard Zazenski, the Regulatory Affairs Manager of IMERYS' predecessor Luzenac, commemorate Defendants' ongoing conspiracy and agreement to  manipulate the review process of regulatory bodies and watchlist groups.

49.     In an email chain from October 2007 ("the Zazenski emails"), with the subject heading "Talc – IARC – Prop 65 – J&J," Luzenac's Regulatory Affairs Manager recounted an "off the record" discussion he had with JOHNSON & JOHNSON's Director of Toxicology, Tim McCarthy, regarding Defendants' "coordinated" "California plan" to surreptitiously manipulate the findings of the CIR and the FDA in relation to talc. The Zazenski emails state:

> 2. CIR review – Tim is on the CFTA Toxicology committee and designated individuals in that group get to review CIR's scientific literature review when substances under study are in the beginning throws of a review. Normally, CIR's "data dump" of literature is not made available to the public for completeness, but Tim promised me [Zazenski] he would send us the CIR file on talc as soon as it is made available to him (perhaps sometime next year). I think Tim was actually looking for help here and it looks like we will be involved from the early Stages. Tim agreed that FDA usually follows CIR's recommendations 100% of the time – as FDA does not have the resources to conduct there in-depth reviews on cosmetics…

> 3. California (Prop 65 and the California Safe Cosmetics Act of 2006) … Tim is concerned about the potential "fire storm" that may erupt upon IARC's publication of the talc monograph … Tim stated that he (and his department) are fighting one crisis after another … and he would like to get a jump start on responding to potential actions in California.

*See* IMERYS 322334-37.

50.     The Zazenski emails, along with a Rio Tinto Minerals Highlight Report dated June 2009, reveal that JOHNSON & JOHNSON's Director of Toxicology used his unique position on the CFTA

12

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 17**

Toxicology Committee to manipulate the CIR's review, and therefore the FDA's opinion, by stacking the bibliography of literature reviewed by the CIR with industry-favorable articles provided directly by Luzenac. *See* IMERYS 322334-37; IMERYS 326977 ("CIR will complete a literature review of talc in 2009; J&J and RTM will assist with bibliography of published literature on talc health effect").

51.     The Zazenski emails also establish that Defendants' "California plan" to combat a Proposition 65 listing relied on the expertise of a California consultant, Jay Murray, who received joint payments from Defendants and Imerys pursuant to their "cost sharing arrangement" for his services. The Zazenzki emails state:

> In dealing with our last go-around with IARC where Gary Goldberg wanted to ensure that we would partner with J&J and not do anything that might undermine their interest or strategies, we'll just have to keep this in mind for out California plans. Fortunately, with Jay [Murray] as the middleman, I don't anticipate any major problem here.
>
> … We [Tim McCarthy and Richard Zazenski] agreed that we should get Jay Murray to map out his thoughts on a strategy for the near future. I proposed to Tim that perhaps we could come to some sort of cost sharing arrangement for our California consultants…

*See* IMERYS 322334-37.

52.     The Zazenski emails also confirm that Defendants' and Imerys' talc-based interests "are very much in concert" such that it was important that Luzenac "ensure that [they] partner with J&J and not do anything that might undermine their interests or strategies." In fact, Zazenski expressed that "the 'stars' are aligning for a comprehensive [California] approach (with the prospect of J&J funding a good portion of the costs)." *See* IMERYS 322334-37.

53.     At all times pertinent, the impact of a Proposition 65 listing was and is relevant to Defendants' conspiracy to fraudulently mislead national regulatory bodies or watchlist groups, such as IARC, the NTP, the FDA, and CIR.

54.     In 2000, when the NTP—an authoritative body in the area of carcinogenicity—was considering whether to add talc to its Report on Carcinogens list of substances that may pose a hazard to human health, JOHNSON & JOHNSON internally acknowledged:

> **Impact of the Report**
> While reports themselves are not regulatory, listing of a substance has a major impact on companies, the media covers the review process. According to Clay Frederick of Rohm and Haas and James Bus of Dow

Chemical each felt a demonstrable economic impact, as customers shield away from using their products– a known carcinogen. But listing in the report also prompts listing under the California Safe Drinking Water and Toxic Enforcement Act of 1986, better known by its original name, Proposition 65, requiring a warning label in that state, and inclusion of the information on Material Safety Data Sheets under OSHA.

See JNJ 000019927.

55.     Email communications that same year from the Regulatory Affairs Manager of IMERYS' predecessor, Luzenac, confirmed the following:

NTP's decision could be devastating to all of Luzenac's talc business (OSHA labeling requirements, Prop 65, Canadian Regulations, etc.). As such, we are exploring all avenues of challenge to this review… I have kept J&J informed of our dealings…

See IMERYS 024243.

56.     In or about 2006, when IARC– a "highly influential agency" whose mission is to identify causes of cancer so preventative measures may be adopted against them– began investigating whether there is a credible association between talc use in the perineal area and ovarian cancer, Rio Tinto Minerals implemented a defense strategy, which expressly included the need to "coordinate" its actions with the JOHNSON & JOHNSON Defendants:

IARC does not set or enforce policy or legislation aimed at controlling carcinogens, but it is a highly influential agency. For example, in the United States, many agencies automatically recalibrate their regulations based on IARC monographs. An IARC ruling on talc could also alter the way talc is considered under the European Union's regulatory framework for the Registration, Evaluation and Authorization of Chemicals (REACH).

As far-reaching as these regulator changes will be, it is the customer response which could be the quickest and have the most impact on the business, largely through the use of Potential Banning Lists in product formulations…

Therefore, Rio Tinto Minerals must develop its long-term mitigation and short-term communications plans as quickly as possible to minimize the impact of this potential ruling on the business.

**Potential Impacts**
Although an IARC ruling that talc is possibly or probably a cancer agent (Group 2A or 2B) would directly impact cosmetic and personal care markets– which represents 1.5 percent of talc revenues – the two most significant negative impacts are potential health-related legal liability and customer substitution of talc by other mineral in all markets. These impacts would also likely bring new applications development to a grinding halt.

14

IARC reclassification will also involve the following implication for Rio Tinto Minerals in the U.S., which also have effects worldwide: … State level regulations, including Prop 65 listing in California, which automatically adds IARC-listed substances…

**Stakeholders**
A critical aspect of this mitigation plan involves creating alliances with, and communicating clearly and consistently to key stakeholders, including: … Rio Tinto Minerals customers

**Objectives**
▪ Establish a plan for influencing regulators on how they apply the IARC findings
▪ Work closely with body powder customers to ensure a coordinated approach

**Strategy and Action Plan**
…Legal – Ralph Godell ([Luzenac]Team Lead)
Legal strategy will focus on minimizing potential liability
*Actions*
▪ Coordinate actions with leading body powder customer (principally J&J)"

*See* IMERYS-A 0021868.

57.    In order to protect the profitability of their operations, the JOHNSON & JOHNSON Defendants and IMERYS, and/or their predecessors-in-interest, partnered and conspired with one another to  conceal the known dangers of talc from the various regulatory bodies and watchlist groups by willfully misrepresenting and suppressing the truth regarding the risks and dangers associated with the use of the talcum powder contained within the PRODUCTS.

c.    ***Asbestos and Proposition 65 in Relation to Talc***

58.    Asbestos appeared on the Proposition 65 list as a carcinogenic chemical on February 27, 1987, and remains on the list today. Following the 1987 IARC classification of talc containing asbestiform fibers as carcinogenic to humans (Group 1), talc containing asbestiform fibers was added to the Proposition 65 list on April 1, 1990. *See* IMERYS 240730; IARC 1987a; https://oehha.ca.gov/proposition-65/chemicals/asbestos; https://oehha.ca.gov/proposition-65/chemicals/talc-containing-asbestiform-fibers.

59.    The presence of asbestos in the talc placed Defendants' PRODUCTS within the ambit of Proposition 65 warnings. However, despite knowledge of the presence of asbestos and asbestiform talc in the PRODUCTS and rather than taking action to warn the public or taking the products off the shelf, Defendants and Imerys doubled down efforts to stave off the inclusion of talc from the Proposition 65 list and jointly enlisted California Proposition 65 specialist Jay Murray. *See* IMERYS 322334-37.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 20**

60.     Talc consists of plate-like structures ("platy talc") as well as talc fibers ("asbestiform talc"). Talc fibers are similar to asbestos fibers in size, shape, and chemical composition. *See* Rohl, 1974; Rohl, et al., 1976. Talc and asbestos are so closely related geologically that a single fiber may exhibit both anthophyllite asbestos and talc characteristics, indicating the very close association between these two minerals. *See* Virta, 1985; NIOSH, 2011. Exposure to fibrous talc has a greater potential for causing adverse biological effects than exposure to platy talc. *See* Rohl, et al., 1976.

61.     The similarities in potential adverse health effects from fibrous talc and asbestos exposure have been known since the 1970s. For example, during a U.S. Department of Interior Talc Symposium in May 1973, a speaker from the Mt. Sinai School of Medicine expressed the view that asbestos exposure standards should be applied to fibrous talc exposures. *See* JNJ000231422.

62.     Talc deposits in the earth and talc ore are not pure substances. Talc deposits are often found intermingled with asbestos deposits, and talc can contain various constituents including asbestos, crystalline silica, arsenic, and heavy metals such as cadmium, cobalt, chromium, lead, and nickel. *See* Cralley, 1968; Ross, 1974; Rohl, et al., 1976; Van Gosen, et al., 2004; Gondal, et al., 2012; Rehman et al., 2013. Johnson & Johnson obtained its talc ore from talc deposits known to be interspersed with chrysotile and amphibole asbestos. *See* Ross, 1974; Van Gosen, et al., 2004; s*ee also* JNJ000064544; JNJMX68_000017827; JNJAZ55_000006341; IMERYS 242050.

63.     Chromium, nickel, asbestiform talc and asbestos have been identified as known carcinogens. *See* IARC Monograph 2012.

64.     Analyses of commercially available talc, including Defendants' talcum powder PRODUCTS revealed varying levels of talc fibers. *See* Cralley, et al., 1968; NIOSH, 1972; Lockey, 1981; Paoletti, et al., 1984; Gordon, et al., 2014.

65.     Despite claims that Defendants' talcum powder PRODUCTS manufactured after the mid-1970s were "asbestos free," asbestos fibers have been found in talcum powder PRODUCTS placed on the marketplace since that time. *See* Paoletti, et al., 1984; Blount, 1991; Mattenklott, et al., 2007; Moon, et al., 2011; *see also* JNJ000064544; JNJI4T5_000004109-4112; IMERYS 242050.

66.     Dr. Blount testified that the talc used in her 1991 study was Defendants baby powder purchased off the shelf.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 21**

67.    In 2004, reporter Dave Walker of KCRA TV, a Sacramento, California television station, sent Johnson's baby powder to Forensic Analytical, a laboratory in Hayward, California, for analysis on a Special Report concerning the harmful levels of asbestos in the community. *See* JNJI4T5_000004109-4112. When the Hayward, California, laboratory discovered asbestos in the JOHNSON & JOHNSON's baby powder product, KCRA TV contacted the JOHNSON & JOHNSON Defendants with the results. the JOHNSON & JOHNSON Defendants alerted Luzenac and demanded testing data on their products which Luzenac could not produce because Luzenac's Global Lab manager in California failed to keep up with critical testing of quarterly samples to detect the presence of asbestos in Defendants' talcum powder PRODUCTS:

> Johnson & Johnson called us frantically, because some outside lab apparently found asbestos in off-the-shelf baby powder. Some expose' will be coming out . . . But, it prompted J&J to ask us where all the data was on their product. I was supposed to be doing quarterly samples by TEM, but they were all in the backlog. Since 2001. Oops... I had to scramble and try to catch up. I worked like crazy and it was the source of a "HIPO" (high potential for loss incident).

*See* IMERYS 299277; IMERYS 299323.

68.    A 2017 examination of the JOHNSON & JOHNSON Defendants' baby powder confirmed the presence of asbestos and fibrous talc. *See* Longo, et al. 2017 report and testimony.

69.    A 2018 examination of Defendants' PRODUCTS confirmed the presence of asbestos and fibrous talc in a high number of samples from post mid-1970s. *See* Longo, et al. 2018 report.

70.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, all allegations concerning Defendants include Defendants' parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, aiders and abettors, organizational units of any kind, predecessors, successors and assigns, and their officers, directors, employees, agents, representatives, and any and all other persons acting on behalf of Defendants.

71.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants and Imerys, and each of them were the agents of each of the other Defendants and Imerys, and acting within the course and scope of such agency, and were joint venturers and aiders and abettors in commission of the wrongful conduct alleged.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 22**

72.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times, Defendants were engaged in the business of placing the PRODUCTS into the stream of commerce by designing, manufacturing, marketing, packaging, labeling, distributing and/or selling said PRODUCTS to residents of California and residents of other states, including Plaintiff herein, and that JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. and its successor entities designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, labeled, and sold the PRODUCTS to consumers, and IMERYS TALC AMERICA, INC. mined, extracted, sorted, milled, processed, treated, analyzed, treated, formulated, packaged, sold, and shipped the talcum powder that comprises the PRODUCTS to JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER INC. F/K/A JOHNSON & JOHNSON CONSUMER COMPANIES, INC. for sale, without substantial change, to the general public worldwide and to residents of California and residents of other states.

73.    Upon information and belief, Plaintiff purchased the PRODUCTS and used said PRODUCTS on a daily basis in and around her perineal regions.  The Plaintiff further used the PRODUCTS to dust other parts of her body, including her underarms, and applied them to her sanitary pad each month for approximately one week during her menstruation.

74.    Upon information and belief, Plaintiff purchased the PRODUCTS and used the PRODUCTS by applying the PRODUCTS to her body in accordance with the instructions for use that accompanied the PRODUCTS and in a reasonably foreseeable manner.

75.    Upon information and belief, Plaintiff developed ovarian cancer, and suffered effects and sequelae therefrom, as a direct and proximate result of the unreasonably dangerous and defective nature of talcum powder, the main ingredient of the PRODUCTS, and Defendants' wrongful and negligent conduct in the research, development, testing, manufacture, production, formulation, processing, packaging, promotion, distribution, marketing, and sale of the PRODUCTS and/ or the talcum powder that comprises the PRODUCTS.

76.    Upon information and belief, as a direct and proximate result of the injuries alleged herein, Plaintiff has incurred and will in the future incur both general and special damages as hereinafter alleged.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 23**

77.     Plaintiff is informed and believes, and based thereon alleges that, all claims in this action are a direct and proximate result of Defendants' and/or their corporate predecessors negligent, willful, and wrongful conduct as follows: Defendants' design, development, manufacture, testing, promoting, marketing, labeling, sale, mining, extraction, processing, treatment, formulation, packaging, and distribution of the PRODUCTS.

78.     Plaintiff in this action seeks recovery for damages as a result of ovarian cancer, which was directly and proximately caused by such wrongful conduct by Defendants, the unreasonably dangerous and defective nature of the talcum powder, the main ingredient of the PRODUCTS.

79.     Plaintiff developed ovarian cancer, and suffered effects attendant thereto, as a direct and proximate result of the unreasonably dangerous and defective nature of the PRODUCTS and the talcum powder therein, and Defendants' wrongful and negligent conduct as follows: Defendants' design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, sale, mining, extraction, processing, treatment, formulation, packaging, and distribution of  the PRODUCTS, and as a direct and proximate result of these injuries, Plaintiff has incurred and will incur medical expenses in the future, has endured and will endure pain and suffering, has endured and will endure loss of enjoyment of life, has endured and will endure other general and special damages, and has otherwise been damaged in a personal and pecuniary nature.

80.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, all Defendants were engaged in the research, development, manufacture, design, testing, sale and marketing of PRODUCTS as follows:  Defendants' design, development, manufacture, testing, promoting, marketing, , labeling, sale, mining, extraction, processing, treatment, formulation, packaging, and distribution of the PRODUCTS, and Defendants introduced said PRODUCTS into interstate commerce with knowledge and intent that such PRODUCTS be sold to consumers in the State of California and the United States.

81.     Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, IMERYS TALC AMERICA, INC. ("IMERYS") was not merely a raw materials supplier. Rather, IMERYS actively designed, developed, and formulated talc for specific uses.

Asbestos and Proposition 65 in Relation to Talc

*d.*　　***Facts Relating to Defendants' Successor Liability***

82.　　The Kim LTL Declaration, filed in the LTL bankruptcy cases, summarizes J&J's and its affiliates' corporate history that is pertinent to the claims alleged herein against the Defendants as follows:

i.　　"J&J, a New Jersey company incorporated in 1887, first began selling Johnson's Baby Powder in 1984, launching its baby care line of products."

ii.　　"In 1972, J&J established a formal operating division for its baby products business, which included Johnson's Baby Powder… J&J transferred all its assets and liabilities associated with the baby products division to J&J Baby Products."

iii.　　In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products. In turn, Omni assumed all liabilities of J&J Baby Products except those liabilities related to its diaper program. Immediately following the transaction, J&J Baby Products merged into another subsidiary of J&J and was renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company."

iv.　　In 1988, Johnson & Johnson Baby Products Company transferred all its assets in respect of its baby products business to Johnon & Johnson Dental Products Company, which assumed all of its liabilities and was renamed Johnson & Johnson Consumer Products, Inc."

v.　　In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer Companies")."

vi.　　In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil-PPC, Inc. The resulting entity was renamed Johnson & Johnson Consumer Inc. (including all former names and historical forms, "Old JJCI")."

vii.　　Old JJCI became responsible for all claims alleging that Johnson's Baby Powder and other talc-containing products cause cancer or other diseases… Old JJCI also became

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 25**

responsible for all claims alleging that Shower to Shower products, which contained talc, caused cancer or other diseases."[1]

83.    J&J and its subsidiary, "Johnson & Johnson Consumer Inc.," both in the form of "Old JJCI" and "New JJCI," were at all times materially responsible for the design, labeling, marketing, distribution, and sale of J&J's body powder product lines, including iconic Johnson & Johnson Baby Powder product line.

84.    Each and every one of the J&J corporate entities, including itself and its affiliated companies involved or associated with talc business and PRODUCTS, were at all times material to this case aware that raw talc ingredient and/or resulting talc-based PRODUCTS contained asbestos, and each and all collectively actively concealed such fact from the public for decades.

85.    Prior to the 2021 implementation of J&J's multifaceted restructuring of its consumer product subsidiaries, Old JJCI and its predecessors milled, manufactured, labeled, sold, supplied, distributed, and/or marketed asbestos-containing PRODUCTS to which Plaintiff was exposed.

86.    In an effort to avoid or eliminate J&J and OLD JJCI's respective responsibility and liability for injuries and harm caused by Johnson & Johnson Baby Powder, as well as other talc PRODUCTS, in or about October 2021, Old JJCI underwent a series of corporate restructuring transactions under Texas state corporation and business law in which it split itself into two separate entities through a device referred to as a "divisive merger," more commonly known as the "Texas Two Step."

87.    Prior to October 2021, J&J's subsidiary Johnson & Johnson Consumer Inc. ("Old JJCI"), was a New Jersey corporation with its principal place of business in the State of New Jersey. Old JJCI engaged in the business of researching, developing, formulating, manufacturing, designing, testing, licensing, selling, distributing, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, the PRODUCTS. As of October 2021, Old JJCI was worth more than $61.5 billion.

88.    In October 2021, rather than declare bankruptcy themselves, J&J and Old JJCI engaged in a maneuver referred to as the "Texas Two-Step." First, at J&J's instruction, Old JJCI merged into Chenango Zero, LLC, a Texas limited liability company. Then, Chenango Zero, LLC effected a divisional merger

---

[1] Plaintiff does not agree with this statement that Old JJCI became responsible for all claims, especially not claims related to J&J's independent, non-derivative liability.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 26**

under the Texas Business Organizations Code, resulting in the dissolution of Chenango Zero, LLC and the formation of two new companies: Chenango One, LLC and Chenango Two, LLC. Following the divisional merger, Old JJCI ceased existence. All Old JJCI legacy talc-related liabilities were transferred to the newly created Chenango One, LLC, and all remaining Old JJCI operating assets were transferred to Chenango Two, LLC. Chenango One, LLC then reincorporated in North Carolina and changed its name to LTL Management LLC. Chenango Two, LLC merged into Curahee Holding Company Inc., which name was then changed to Johnson & Johnson Consumer Inc. ("New JJCI").

89.     After the Old JJCI/Chenango Zero, LLC merger, Old JJCI ceased to exist.

90.     Second, within 48 hours of the creation of LTL and transfer of Old JJCI operating assets to New JJCI, LTL declared bankruptcy, strategically leaving Old JJCI's productive operations and trade creditors outside of the bankruptcy. With no employees or preexisting business, LTL had nothing to "reorganize." As acknowledged by the newly formed organization, LTL was created solely to resolve talc claims in bankruptcy, away from juries. The resulting bankruptcy operated for the benefit of nondebtors who sat outside the bankruptcy in control of the business – while litigation involving rapidly dying cancer victims was halted, including this JCCP.

91.     The corporate restructuring was designed and undertaken with the intent to isolate the talc liabilities of Old JJCI into a newly invented company created by J&J. LTL is an acronym for "Legacy Talc Litigation." (LTL has subsequently changed its name to LLT Management LLC.)

92.     LTL was immediately thereafter put into a Chapter 11 Bankruptcy wherein LTL and other J&J entities sought the protection of the Bankruptcy Code's processes and machinery to obtain a stay of all pending litigation and construct an aggregate resolution of its outstanding present and future asbestos liabilities that would foreclose jury trials and reduce the compensation they would owe to those harmed by its PRODUCTS and their families, given that J&J and its subsidiaries were increasingly being held liable by juries in lawsuits brought by talc asbestos claimants and were being ordered to pay compensatory and exemplary damages.

93.     As part of J&J's liability avoidance/limiting corporate restructuring, all of the productive assets of Old JJCI, including those used to manufacture and market J&J Baby Powder, were transferred to a newly minted corporate entity named "Johnson & Johnson Consumer Inc." ("New JJCI"). New JJCI,

upon receipt of the Old JJCI's operating assets continued to sell J&J Baby Powder, as Old JJCI had previously done, and as J&J itself had done when it directly marketed the product line through an internal division.

94.    Over the objection of tens of thousands of personal injury and wrongful death tort plaintiffs, the Bankruptcy Court presiding over LTL's 2021 bankruptcy case stayed and enjoined prosecution of all litigation against not only the Debtor but all cosmetic talc injury related litigation involving J&J and New JJCI.

95.    During LTL's bankruptcy proceedings, representatives of the affected personal injury and wrongful death tort victims challenged J&J's Texas Two Step scheme before the Bankruptcy Court. After losing their challenges before the Bankruptcy Court, they were ultimately successful on appeal before the United States Court of Appeals for the Third Circuit, which on January 30, 2023, ruled that the Bankruptcy filing by LTL was not proper and ordered that LTL's 2021 Bankruptcy case be dismissed. *In re: LTL Management, LLC*, No. 22-0007, 2023 WL 2760479 (3d Cir., decided Jan. 30, 2023; opinion entered Mar. 31, 2023).

96.    LTL's efforts to obtain re-argument before the Third Circuit panel hearing its appeal or an en banc hearing were denied, and the Appeals Court's mandate to the Bankruptcy Court was issued by the Third Circuit Clerk on March 31, 2023, thereby triggering the lower court's duty to enter an order dismissing the case.

97.    Within hours of the LTL Bankruptcy Court issuing its ensuing dismissal order on April 4, 2023, LTL filed a second Chapter 11 petition for bankruptcy protection in the same court, seeking the same relief as in the dismissed case, claiming its funding sources and arrangements had been replaced and reconfigured in such way that purportedly overcame the Third Circuit's reasons for ordering the earlier bankruptcy case be dismissed.

98.    Unbeknownst to Plaintiffs, during the time the Third Circuit Court of Appeals was considering the propriety of LTL's bankruptcy filing, New JJCI began the process of moving its assets and business to yet another J&J subsidiary, Defendant KENVUE., by transfers through JJCI's direct parent, Janssen Pharmaceuticals, Inc.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 28**

99.     According to the Kim Declaration, as part of J&J's further corporate restructuring, New JJCI changed its name to "Johnson & Johnson Holdco (NA) Inc." ("Old Holdco"), a New Jersey corporation. His declaration before the Bankruptcy Court additionally revealed that "in early January 2023, [New JJCI] transferred its Consumer Business assets to its parent entity."

100.    While Mr. Kim's declaration does not expressly state who the parent entity is, a careful examination of the affidavit demonstrates that Janssen Pharmaceuticals, Inc., is the parent entity of Defendant New JJCI. *Id*. Figure 1 below is from an Exhibit to Kim's Declaration and shows that Janssen is the parent that received all of the JJCI assets used to manufacture, market, and sell J&J Baby Powder.



101.    On January 4, 2023, Defendant KENVUE, another J&J subsidiary, submitted its first filing with the Securities and Exchange Commission ("SEC"), an S-1 registration of securities form. Kenvue Inc. Form S-1 Registration Statement Under the Securities Act of 1933 (Jan. 4, 2023).

102.    In its SEC registration filing, KENVUE sets forth the products that it claims to manufacture and sell in the United States. In this regard, KENVUE represented to the SEC and the public: "A number of **our products marketed in the United States**, including many of our products in our Skin Health and Beauty segment, are considered cosmetics regulated by the FDA through the Federal Food, Drug, and

Cosmetic Act and the Fair Packaging and Labeling Act. **Our cosmetic products include** Aveeno Restorative Skin Therapy Oat Repairing Cream, Aveeno Restorative Skin Therapy Sulfate-Free Body Wash, **Johnson's Baby Powder** and certain of our Listerine mouthwash products." *Id*. (emphasis added).

103. KENVUE acknowledged in its SEC S-1 filing that it may be held accountable for the harm caused by the talc-based PRODUCTS it is responsible for: "It is also possible that various parties will seek to bring and will be successful in bringing claims against us, including by raising allegations that we are liable for the Talc-Related Liabilities." *Id*

104. KENVUE further acknowledges itself as the company responsible for the manufacture of Johnson's Baby Powder indicating that it "may be subject to additional claims . . . related to the sale of **talc-based Johnson's Baby Powder in markets where we have discontinued** this product **(such as in the United States** and Canada), including potential governmental inquiries, investigations, claims and consumer protection cases from state attorneys general." *Id*. (emphasis added).

105. KENVUE also acknowledges that it is "responsible for all liabilities on account of or relating to harm arising out of, based upon, or resulting from, directly or indirectly, the presence of or exposure to talc or talc-containing products sold outside the United States or Canada." *Id.*

106. As such, KENVUE is responsible individually and as successor to all predecessor entities involved in the manufacturing, marketing, and sale of the asbestos-containing talc PRODUCTS to which the Plaintiff was exposed.

107. The bottle for the cornstarch-based formulation Johnson's® Baby Powder, which is sold today in the United States, states: "For over 125 years JOHNSON's® formulas have been specially designed for baby's unique and delicate skin. Great for kids and adults too!"

108. KENVUE admits in its SEC filing that while J&J transitioned to a cornstarch-based formula for Johnson's® Baby Powder in the United States and Canada in 2020, it was still distributing talc-based Johnson's® Baby Powder in other markets and continued to do so until sometime in 2023. *Id*. at 63, 330.

109. Following the creation of KENVUE until at least 2024, it remained possible, through Amazon's online shopping website, to purchase talc-based Johnson's Baby Powder and have it delivered to the customer. (Transcript of Motions May 24, 2023, *Naranjo, et. al., v. Johnson & Johnson, et al.*, Vol. 1 of 2, at 44:18-45:10).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 30**

110.    KENVUE's website lists Johnson's as one of its "iconic brands" under the categories of "Skin health & Beauty – Face & body" and "Essential health – Baby care". https://www.kenvue.com/brands.

111.    Following the link to the Johnson's brand page, one finds Johnson's Baby Powder, amongst a variety of baby care products. https://www.johnsonsbaby.com/baby-products.

112.    On KENVUE's Johnson's brand website's FAQ page, under the questions "Why did Johnson's® reformulate?" and "How have the Johnson's® products changed?" KENVUE indicates it has generally reformulated its line of Johnson's baby products recently based on its continued scientific research and input from parents. https://www.johnsonsbaby.com/faq#why-did-johnson s-reformulate and https://www.johnsonsbaby.com/faq#how-have-the-johnson-s-products-. As with its corn-starch-based Johnson's Baby Powder, KENVUE continues to market these reformulated products under the trusted Johnson's brand name.

113.    The Johnson & Johnson Defendants named and identified herein are either (a) corporations organized under the laws of the various states of the United States of America that were and are doing business in the State of California that mined, milled, manufactured, sold, supplied, distributed, purchased, and/or marketed PRODUCTS to which Plaintiff was exposed; or (b) are a successor in interest of such corporations described in clause "(a)" which the law holds responsible and liable for injuries and harm caused by their predecessor(s) or by their predecessor's product lines it or they acquired which, as a consequence, renders them liable under law to the Plaintiff for the injuries and damages that are the subject of this suit.

114.    At all relevant times, the Johnson & Johnson Defendants have engaged in the research, development, formulation, manufacture, design, testing, licensing, sale, distribution, marketing and/or introduction into interstate commerce, either directly or indirectly through third parties or related entities, the PRODUCTS.

115.    KENVUE is liable individually and as a successor in interest to New JJCI and Old JJCI because the transfer of assets from Old JJCI to New JJCI and then from New JJCI to KENVUE were designed with the improper and fraudulent purpose of escaping responsibility for such debts and liabilities

of Old JJCI. In transferring assets from Old JJCI to New JJCI and then from New JJCI to KENVUE, assets have been put beyond the reach of plaintiffs which would have otherwise been available.

116.    KENVUE is liable individually and as a successor in interest to New JJCI and Old JJCI because the intent of the transactions was for KENVUE to assume all or substantially all operating assets of Old JJCI and to manufacture essentially the same line of products as did Old JJCI.

117.    KENVUE is liable individually and as a successor in interest to New JJCI and Old JJCI because KENVUE will continue to manufacture the same product lines and sell the same products to the same customers as did Old JJCI. Further, the transactions were done while preserving a continuity of management, personnel, physical locations, assets, and general business operations. KENVUE is a mere continuation of Old JJCI.

118.    In 2024, Defendant J&J caused an additional series of corporate transactions to occur prior to causing a subsidiary to file bankruptcy for a third time (the "2024 Corporate Restructuring").

119.    During the 2024 Corporate Restructuring, Old Holdco converted from a New Jersey Corporation to a Texas limited liability company named J&J Holdco (NA) LLC ("Holdco Texas"). Defendant J&J then caused LLT to merge into Holdco Texas with Holdco Texas as the surviving entity and LLT ceasing to exist.

120.    The next step in the 2024 Corporate Restructuring was for Holdco Texas to undergo a divisional merger where Holdco Texas ceased to exist and was split into three entities: 1) Defendant RED RIVER; 2) Pecos River Talc LLC; and New Holdco (Texas) LLC. Defendants contend that as a result of this divisional merger: 1) Defendant RED RIVER was allocated and now holds all talc-related liabilities relating to gynecological disease; 2) Pecos River Talc LLC was allocated and now holds all Canadian talc injury claims, all talc-related claims by governmental entities, and all talc personal injury claims relating to mesothelioma and lung cancer; and 3) New Holdco (Texas) LLC was allocated and holds all other assets of J&J Holdco (NA) LLC.

121.    After the divisional merger, New Holdco (Texas) merged with and into J&J Intermediate Holding Corp., a New Jersey Corporation and New Holdco (Texas) cased to exist. J&J Intermediate Holding Corp. was then renamed Johnson & Johnson Holdco (NA) Inc. ("New Holdco.")

122.    New Holdco is the direct parent of Defendant RED RIVER.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 32**

**COMMON FACTUAL ALLEGATIONS**

a.    ***Introduction to the PRODUCTS***

123.    Historically, the PRODUCTS, which include "Johnson's Baby Powder" and "Shower to Shower," have represented freshness, cleanliness, and purity.

124.    Upon information and belief, at all relevant times alleged herein, the J&J Defendants advertised and marketed "Johnson's Baby Powder" as the beacon of "freshness" and "comfort," eliminating friction on the skin, absorbing "excess wetness" helping keep skin feeling dry and comfortable, and "clinically proven gentle and mild". The J&J Defendants compelled women through advertisements to dust themselves with this product to mask odors. The bottle of "Johnson's Baby Powder" specifically targets women by stating, "For you, use every day to help feel soft, fresh, and comfortable."

125.    Upon information and belief, at all relevant times alleged herein, the J&J Defendants advertised and marketed the product "Shower to Shower" as safe for use by women, as evidenced in its slogan, "A sprinkle a day keeps odor away," and through advertisements such as, "Your body perspires in more places than just under your arms.  Use SHOWER to SHOWER to feel dry, fresh, and comfortable throughout the day," and "SHOWER to SHOWER can be used all over your body."

126.    Plaintiff herein used the PRODUCTS to dust her perineum for feminine hygiene purposes. This was an intended and foreseeable use of the PRODUCTS based on the advertising, marketing, and labeling of the PRODUCTS.

127.    Upon information and belief, the PRODUCTS are composed almost entirely of magnesium trisilicate, also known as talc. Talc is an inorganic mineral that is mined from the earth.

128.    Upon information and belief, at all relevant times, IMERYS supplied its customers, including the JOHNSON & JOHNSON Defendants, with material safety data sheets for talc. These material safety data sheets are supposed to convey adequate health and warning information to customers.

129.    Upon information and belief, since as early as the 1970s, IMERYS and the J&J Defendants have been on notice of an association between talc exposure and ovarian cancer, as discussed more fully below.

130.     Upon information and belief, since the 1970s, the J&J Defendants have nonetheless continually advertised and marketed the PRODUCTS as safe for human use, and IMERYS TALC

28
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 33**

AMERICA, INC. has marketed and promoted talcum powder, the main ingredient of the PRODUCTS, as safe for human use. Upon information and belief, the J&J Defendants decided to downgrade the quality of the talc product supplied by IMERYS and informed IMERYS to supply a downgraded version of the talc product to use in its PRODUCT in order to reduce costs and increase profits for the J&J Defendants.

131. At all relevant times alleged herein, a feasible alternative to the PRODUCTS has existed. Cornstarch is an organic carbohydrate that is quickly broken down by the body with no known health effects. Cornstarch powders have been sold and marketed for the same uses as the PRODUCTS with nearly the same effectiveness.

**b.** ***Timeline of the Scientific Literature Analyzing the Relationship Between Talc and Ovarian Cancer***

132. Research published as early as 1961 has established that particles, like talc, can translocate from the exterior genital area to the ovaries in women. See G.E. Egli, and Michael Newton, The Transport of Carbon Particles in the Human Female Reproductive Tract, 12 FERTILITY STERILITY 2, 151-155 (1961).

133. Due to talc's potential for transmission, researchers remained concerned about its carcinogenic nature and the effects of use. In 1968, a study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley et al., Fibrous and Mineral Content of Cosmetic Talcum PRODUCT, 29 AM. INDUSTRIAL HYGIENE ASSOC. J. 350-354 (1968). A 1976 follow-up study concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Arthur Rohl, et al., Consumer talcums and powders: mineral and chemical characterization, 2 J TOXICOL ENVIRON HEALTH 255-284 (1976).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 34**

134.    In 1971, the first study was published that suggested an association between talc and ovarian cancer. This study was published by W. J. Henderson in Cardiff, Wales at the Tenovus Institute.  The study found talc particles "deeply embedded" in ten of thirteen ovarian tumors, twelve of twenty-one cervical tumors, one primary carcinoma of the endometrium and five of twelve "normal" ovaries from women with breast cancer. W. J. Henderson et al., *Talc and carcinoma of the ovary and cervix*, 78 J. OBSTET. GYNAECOL. BR. COMMW. 3, 266-272 (1971).

135.    FDA concluded in 2014 concerning talc, "…the potential for particulates to migrate from the perineum and vagina to the peritoneal cavity is indisputable." *See* FDA letter April 1, 2014. The body of scientific literature supports FDA conclusion. *See* Egli, et al., 1961; de Boer, 1972; Parmley and Woodruff, 1974; Phillips, et al., 1978; Venter and Iturrulde, 1979; Blumenkratz, et al., 1980; Gardner, et al., 1981; Venter and Iturrulde, 1981; Holme, et al., 1984; McCalley, et al., 1985; Wright, et al., 1996; Kunz, et al., 1996; Heller, et al., 1996; Kunz, et al., 1997; Edelstam, et al., 1997; Kadanali et al., 2001; Kunz and Leydendecker, 2001; Kissler, et al., 2004; Sjosten, et al., 2004; Kunz, et al., 2007; Zervomanolakis, et al., 2007; Cramer, et al., 2007.

136.    In 2004, in a communication from IMERYS to the JOHNSON & JOHNSON Defendants, IMERYS acknowledged "compelling evidence" for migration had been published. *See* IMERYS 288328-330.

137.    In 1982, the first epidemiologic study was published on talc powder use in the female genital area. This study was published by Dr. Daniel Cramer and others. This study found a 92% increased risk in ovarian cancer with women who reported genital talc use.  Additionally, it found that talc application directly to the genital area around the time of ovulation might lead to talc particles becoming deeply imbedded in the tissues of the ovary, and perhaps causing foreign body reaction capable of causing growth of epithelial ovarian tissue. This study showed an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer.  Daniel Cramer et al., *Ovarian cancer and talc: a case control study*, 50 CANCER 372-376 ( 1982).

138.    Since 1982, there have been approximately forty (40) additional epidemiologic studies providing data regarding the association of talc and ovarian cancer. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with genital talc use in women:

- In 1983, Patricia Hartage and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washington University Medical Center, published a case-control interview study regarding ovarian cancer.  Although no association was proven due to the small sample size, the study found an "excess relative risk" of 2.5 (95% CI=0.7 to 10.0) of ovarian cancer for women who use talc in the genital area. Patricia Hartage et al., *Talc and ovarian cancer*, 250 JAMA 1844 (1983) *available at* http://jamanetwork.com/journals/jama/article-abstract/1725023.

- In 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 controls found that 52% of the cancer patients habitually used talc on the perineum before their cancer diagnosis. The study showed that women using talc daily on their perineum had 1.45 times the risk of ovarian cancer then women that did not use talc daily, showing a positive dose-response relationship. Alice Whittemore et al., *Personal and environmental characteristics related to epithelial ovarian cancer.  II. Exposures talcum powder, tobacco, alcohol, and coffee*, 128 AM. J. EPIDEMIOL. 6, 1228-1240 (1988).

- A case control study conducted in 1989 found similar results. The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found an increased risk in ovarian cancer with women who reported genital talc powder use more than once per week. Margaret Booth et al., *Risk factors for ovarian cancer: a case-control study*, 60 BR. J. CANCER 4, 592-598 (1989).

- Another case control study conducted in 1989 by Bernard Harlow of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing, and a statistically significant increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum. This study also found a positive dose-response relationship. Bernard Harlow and Neinke Weiss, *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, 130 AM. J. EPIDEMIOL. 2, 390-394 (1989).

- A 1992 study, also by Dr. Harlow, found that frequent and long-term talc use directly on the genital area during ovulation increased a woman's risk of ovarian cancer threefold. The study

31

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

also found "[t]he most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals). Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." This study looked at 235 ovarian cancer cases compared to 239 controls, concluding that "given the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Bernard Harlow et al., *Perineal exposure to talc and ovarian cancer risk*, 80 OBSTET. GYNECOL. 1, 19-26 (1992).

- Also in 1992, a case-control study was conducted by Karin Rosenblatt at the Department of Epidemiology of John's Hopkins School of Hygiene and Public Health. This study showed that the development of ovarian cancer may be associated with genital fiber exposure (especially talc on sanitary napkins), and a relative risk of 4.8 for ovarian cancer development from talc use on sanitary napkins. Karen Rosenblatt et al., *Mineral fiber exposure and the development of ovarian cancer*, 45 GYNECOL. ONCOL. 20-25 ( 1992).

- Another 1992 case-control study conducted by Yong Chen with 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk for ovarian cancer in women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months. Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, 21 INT. J. EPIDEMIOL. 23-29 (1992).

- In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats." Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers. National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No. 421 (September 1993).

- In 1995, a case control study conducted in Australia by David Purdie, involving over 1600 women found a statistically significant 27% increased risk in ovarian cancer for women who

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 37**

regularly use talc in the region of the abdomen or perineum. David Purdie et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study*, 62 INT. J. CANCER 6, 678-684 (1995).

- In 1996, a case-control study similarly found a statistically significant increased risk of ovarian cancer in women who used talc-based powders in their genital area. *See* Asher Shushan et al., *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 FERTIL. STERIL. 1, 13-18 (1995).

- In 1996, the condom industry stopped coating condoms with talc due to the health concerns of ovarian cancer, "[c]oncern about talc as an ovarian carcinogen goes back 50 years in the medical literature. By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer." Marie McCullough, *Women's health concerns prompt condom makers to stop using talc*, Jersey Journal (City Ed.) (Jan. 10, 1996).

- In 1997, a case-control study of 313 women with ovarian cancer and 422 controls found that the women with cancer were more likely to have applied talc powder to their external genitalia area. Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer. Linda Cook et al., *Perineal powder exposure and the risk of ovarian cancer*, 145 AM. J. EPIDEMIOL. 459-465 (1997).

- In 1997, a case-control study conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine, which included over 1,000 women found a statistically significant increased risk for ovarian cancer for women who applied talc via sanitary napkins to their perineum. The study indicated that "[c]ommercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc. When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found," concluding "[t]he results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma. Dusting with talcum powder is not an unusual practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 38**

with little benefit, should be deliberated." Stella Chang and Harvey Risch, *Perineal talc exposure and risk of ovarian carcinoma*, 79 CANCER 12, 2396-2401 (1997).

- A 1998 case-control study conducted in Canada by Beatrice Godard found increased risk of ovarian cancer in women who used talc-based powders on their perineum. Beatrice Godard et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*, 179 AM. J. OBSTET. GYNECOL. 2, 403-410 (1998).

- In 1999, Dr. Cramer conducted a case-control study of 563 women newly diagnosed with epithelial ovarian cancer and 523 controls. The study found a statistically significant 60% increased risk of ovarian cancer in women who used talc-based body powders on their perineum: "[w]e conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute ("NCI"). Daniel Cramer et al., *Genital talc exposure and risk of ovarian cancer*, 81 INT. J. CANCER 3, 351-356 (1999).

- In 2000, Roberta Ness, from University of Pennsylvania, led a case control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation, and that inflammation contributes to cancer cell development. Roberta Ness et al., *Factors Related to Inflammation of the Ovarian Epithelium and Risk of Ovarian Cancer*, 11 EPIDEMIOLOGY 2, 111-117 (2000).

- Also in 2000, a prospective cohort study found a 40% increase in invasive serous cancers in women who applied talc to their perineum. Dorota Getrig et al., *Prospective Study of Talc Use and Ovarian Cancer*, 92 J. NATL. CANCER INST. 3, 249-252 (2000).

- In 2003, a meta-analysis was conducted which re-analyzed data from 16 studies published prior to 2003, finding a 33% increase in ovarian cancer risk among talc users. Michael Huncharek et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: A meta-analysis of 11,933 subjects from sixteen observational studies*, 23 ANTICANCER RES. 2C, 1955-60 (2003).

34

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

- In 2004, a case-control study of nearly 1400 women from twenty-two counties was performed in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use. The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use, compared with women using cornstarch powders as "[c]ornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc." This study concluded that "users should exercise prudence in reducing or eliminating use," and "the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures, talcum powder use is easily avoidable." Paul Mills et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 INT. J. CANCER 458-64 (2004).

- In 2008, Margaret Gates performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study (the "Gates Study"). This study was funded by NCI, and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use. A 60% increased risk of the serous invasive subtype was also found. Dr. Gates noted a pronounced and positive dose-response relationship, increasing risk with increasing talc usage by women. These results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer . . . the finding of highly significant trends between increasing frequency of use and risk 'strengthen[ing] the evidence of an association, because most previous studies have not observed a dose response.'" Notably, the study promoted an alternative to talc, cornstarch, which "has not been shown to increase ovarian cancer risk . . . " The study concluded that "women should be advised not to use talcum powder in the genital area, based on our results and previous evidence supporting an association between genital talc use and ovarian cancer risk. Physicians should ask the patient about talc use history and should advise the patient to discontinue using talc in the genital area if the patient has not already stopped." Margaret Gates et al., *Talc Use, Variants of the GSTM1,*

*GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*, 17 CANCER EPIDEMIOL, BIO. & PREV. 9, 2436-2444 (2008).

- In October of 2008, Michael Thun, Vice-President of Epidemiology and Surveillance Research at the American Cancer Society commented on the Gates Study. He stated the dose-response relationship between talc and ovarian cancer had finally been confirmed by this study: "[T]here are very few modifiable risk factors for ovarian cancer. The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation." Zosia Chustecka and Desiree Lie, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (Oct. 8, 2008) *available at* http://www.medscape.com/viewarticle/581781.

- In 2008, Melissa Merritt, from the Australian Cancer Study and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women, which found a statistically significant increased risk of ovarian cancer for women who used talc on their perineum was confirmed. This study also confirmed a statistically significant increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum. Melissa Merritt et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 INT. J. CANCER 1, 170-176 (2008).

- In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with frequency and duration of talc use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use. In conclusion the study stated, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Anna Wu et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 INT. J. CANCER 6, 1409-1415 (2009).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 41**

- In 2015, Anna Wu looked at the risk factors for invasive epithelial ovarian cancer among Hispanics and African Americans. The study used multivariate logistic regression to examine parity, oral contraceptive use, tubal ligation, endometriosis, family history of ovarian cancer, and talc use and risk of ovarian cancer among Hispanics, African Americans and non-Hispanic Whites using four case control-studies conducted in Los Angeles County. The study found a statistically significant increased risk for ovarian cancer for Non-Hispanics whites of 41% and an additional 14% for every five years of talc use, an increased risk for Hispanics of 77% and an additional 18% for every five years of talc use, and an increased risk for African Americans of 56% and a 15% additional increase for every five years of talc use. Anna Wu et al., *African Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic Whites after considering non-genetic risk actors and oophorectomy rates,* CANCER EPIDEMIOL BIOMARKERS PREV July; 24(7): 1094-1100 (2015).

- In 2018, Ross Pennikilampi and Guy Eslick published a systematic review and meta-analysis of perineal talc use and ovarian cancer. The study found a 31% increased risk of ovarian cancer from any perineal talc use and a higher increased risk for greater than 3,600 lifetime applications of talc (42% increased risk) than less than 3,600 lifetime applications of talc (32% increased risk). The authors reported that an association with ever use of talc was found in case-control studies but not cohort studies. However, cohort studies found an association between talc use and invasive serous type ovarian cancer with a 25% increased risk. The authors concluded that "there is a consistent association between perineal talc use and ovarian cancer" and that "the conformation of an association in cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association." Ross Penninkilampi et al., *Perineal talc use and ovarian cancer: A systematic review and meta-analysis*, EPIDEMIOLOGY; 2Jan; 29(1): 41-49 (2018).

- Meta-analyses systematically combine pertinent qualitative and quantitative study results from multiple studies of related intervention to develop a single result that has greater statistical power. Generally, the result of a meta-analysis is more reliable than the result of any single study related to increased numbers of subjects, greater diversity among subjects and/or

37

accumulated effects and results. *See generally,* Introduction to Meta-Analysis, Borenstein, et al., 2009.s

- There have been seven peer-reviewed meta-analyses and one pooled data publication that report statistically significant positive associations between genital talc exposure and risk of ovarian cancer. *See* Harlow and Cramer, 1992; Gross and Berg, 1995; Cramer and Harlow, 1999; Huncharek, et al., 2003; Langseth, et al., 2008; Terry, et al., 2013; Berge, et al., 2017; Penningkilampi, et al., 2018

c. ***Knowledge of the Connection Between Talc Usage and Ovarian Cancer within the Government, within the Medical Community, and within the Defendant Companies***

139. Upon information and belief, in 1975, the JOHNSON & JOHNSON Defendants were aware of Henderson, *et al.'s* Tenovus data suggesting an association between talc and ovarian cancer, and were thereby on notice of the association as early as the mid-1970s. The JOHNSON & JOHNSON Defendants sent a donation to the Cardiff Scientific Society in order to obtain information concerning research being conducted.

140. Upon information and belief, Dr. Langer of the Mount Sinai School of Medicine sent a letter to Johnson & Johnson in 1971 stating that he had also analyzed the Tenovus tissue samples and substantiated Dr. Henderson's finding of talc particles in the tissue. Dr. Langer reported to Johnson & Johnson that he also found chrysotile asbestos in the Tenovus tissue samples and in samples of Johnson & Johnson talc.

141. Upon information and belief, shortly after Dr. Cramer's 1982 study was published, Dr. Semple visited with Dr. Cramer about his study. Dr. Cramer advised Dr. Semple that the JOHNSON & JOHNSON Defendants should place a warning on its talcum powder PRODUCTS concerning ovarian cancer risks so that women could make an informed decision about their health.

142. Upon information and belief, on August 12, 1982, the JOHNSON & JOHNSON Defendants publicly recognized the studies linking the use of the PRODUCTS to ovarian cancer. In a New York Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," the company admitted to being aware of the 1982 Cramer article that concluded women who apply talc daily to their genital areas were three times more likely to contract ovarian cancer.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 43**

143. Upon information and belief, the JOHNSON & JOHNSON Defendants recognized that the safety of cosmetic powders was a concern in a May 1986 Technological Forecast. The JOHNSON & JOHNSON Defendants recognized that the safety of cosmetic powders was a concern, especially among health professionals, that studies have implicated talc use in the vaginal area with incidents of ovarian cancer and that Johnson's Baby Powder sales were declining along with the overall cosmetic powders market in a classic mature model curve." Upon information and belief, the JOHNSON & JOHNSON Defendants in approximately 1992 were looking for "opportunities to grow" the Baby Powder franchise despite the fact that the same internal document cited cancer linkage as a "major obstacle" and recommended implementing a plan to market to Hispanic and African Americans by launching an adult Hispanic media program and potentially launching an adult black print effort.

144. In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity. Talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.

145. Upon information and belief, on November 10, 1994, the Cancer Prevention Coalition mailed a letter to then JOHNSON & JOHNSON C.B.O, Ralph Larson, informing the company that studies as far back as 1960's "show conclusively that the frequent use of talcum powder in the genital area pose a serious health risk of ovarian cancer." Upon information and belief, the letter cited a recent study from Dr. Harlow of Harvard Medical School confirming this fact and quoted a portion of the study where Dr. Harlow and his colleagues discouraged the use of talc in the female genital area. Upon information and belief, the letter further stated that 14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to detect and has a low survival rate. Upon information and belief, the letter concluded by requesting that the JOHNSON & JOHNSON Defendants withdraw talc products from the market, or at a minimum, place warning information on its talc-based products disclosing the risk of ovarian cancer.

146. Upon information and belief, on September 17, 1997, the JOHNSON & JOHNSON Defendants were notified that on three separate occasions the CTFA (as an agent of Defendants) had released false information to the public about the safety of talc, that studies had shown a statistically significant association between hygienic talc use and ovarian cancer, and that anybody who denies this

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 44**

risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary.

147.    Upon information and belief, in 1998 IMERYS wanted to stop discussions about ovarian cancer in order to free the development in cosmetic applications, avoid the initiation of a process for classification of talc as a carcinogen, and implement a plan to discredit research and scientists.

148.    Upon information and belief, on January 30, 2000, IMERYS was on notice of the National Toxicology Program ("NTP") listing nomination of non-asbestiform talc as carcinogenic and votes in favor of such listing, and acknowledged that the reviewers found that the epidemiology studies associating talc and ovarian cancer providing convincing evidence of talc carcinogenicity in humans.

149.    Upon information and belief, as of September 12, 2000, Luzenac was specifically aware, knew, and acknowledged that the general public was not aware of any health issues regarding talc.

150.    Upon information and belief, as of October 13, 2000, Luzenac was specifically aware, knew, and explicitly acknowledged that that the company would ultimately be held responsible for placing a harmful product into the stream of commerce.

151.    Upon information and belief, in an attachment to a letter sent to the National Toxicology Program on or about March 15, 2002, the CTFA admitted that talc was "toxic," that "some talc particles, as well as asbestos fibers, can reach the human ovaries," and acknowledged prior epidemiologic studies have concluded that talc increases the risk of ovarian cancer in women.

152.    Upon information and belief, internal reports in 2002, indicated that Luzenac may be asked when the company first learned of the possible association of talc with ovarian cancer, when it began to warn of this risk, and whether the company felt a moral and ethical obligation to inform women that the hygienic use of talc may increase their risk for ovarian cancer, or were the company's profits from mining and selling this potentially dangerous, life-threatening product more important than protecting the health and welfare of the women and children in our society.

153.    Upon information and belief, Luzenac considered implementing warnings, including a warning label that would warn the consumers the product is not to be used for genital dusting and would report of the possible association between genital dusting and ovarian cancer.

154. In February of 2006, IARC published a paper whereby they classified perineal use of talc based body powder as a "Group 2B" human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk of ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%. IARC concluded: "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence."

155. In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS).  Asbestos is also classified as "D2A".

156. In December 2018, Environment and Climate Change Canada, Health Canada issued a Draft Screening Assessment of Talc.  The SYNOPSIS indicated that "the meta-analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. Further, available data are indicative of a causal effect. Given that there is potential for perineal exposure to talc from the use of various self-care products (e.g., body powder, baby powder, diaper and rash creams, genital antiperspirants and deodorants, body wipes, bath bombs), a potential concern for human health has been identified." (Draft Screening Assessment Talc. Chemical Abstracts Service Registry Number 14807-96-6. the Environment and Climate Change Canada, Health Canada, December 2018).

157. The 2018 Draft Screening Assessment of Talc also states that, the most recent meta-analysis (Taher et al. 2018), and consistent with the Hill criteria, suggests a small but consistent statistically significant positive association between ovarian cancer and perineal exposure to talc. Further, available data are indicative of a causal effect." It also indicates, as noted by Narod (2016), "It is unlikely that the association between talc and ovarian cancer is due to confounding and so it is fair to say that if there is a statistically robust relationship between talc use and ovarian cancer it is likely to be causal." Similarly,

Penninkilampi and Eslick (2018) noted that "the confirmation of an association in cohort studies between perineal talc use and serous invasive ovarian cancer is suggestive of a causal association." (Draft Screening Assessment Talc. Chemical Abstracts Service Registry Number 14807-96-6. the Environment and Climate Change Canada, Health Canada, December 2018).

158. The 2018 Draft Screening Assessment of Talc also states that the "the meta-analyses of the available human studies in the peer-reviewed literature indicate a consistent and statistically significant positive association between perineal exposure to talc and ovarian cancer. Further, available data are indicative of a causal effect. Given that there is the potential for perineal exposure to talc from the use of various self-care products, a potential concern for human health has been identified." (Draft Screening Assessment Talc. Chemical Abstracts Service Registry Number 14807-96-6. the Environment and Climate Change Canada, Health Canada, December 2018).

159. Upon information and belief, in 2006, IMERYS began placing a warning on the Material Safety Data Sheets (MSDS) it provided to JOHNSON & JOHNSON in conjunction with the talc product it sold to them to be used in the PRODUCTS. These MSDSs provided the warning information about the IARC classification, warning information regarding "States Rights to Know," and warning information about the Canadian Government's "D2A" talc classification.

160. Upon information and belief, in 2006 Luzenac was on notice of the potential for product liability litigation against the talc producers for failing to warn of the health risks associated with Talc use.

161. Upon information and belief, in spite of the mounting evidence pointing to the carcinogenicity of the PRODUCTS, particularly when used in the perineal region, from 2008 through 2009 the JOHNSON & JOHNSON Defendants admitted that their marketing was targeting use of Johnson's Baby Powder for obese women.

**d.** ***Defendants Failed to Warn Consumers of the Dangers of Talc Use***

162. At all times herein mentioned, Defendants had a duty to know and warn about the hazards associated with the use of the PRODUCTS.

163. Upon information and belief, at all times herein mentioned, despite the mounting scientific and medical evidence regarding talc use and ovarian cancer development over the past several decades, none of the warnings on product labels or in other marketing informed users, or similarly situated

individuals, that use of the PRODUCTS in the genital area could lead to an increased risk of ovarian cancer. For example, the only warnings on the Johnson's Baby Powder label are to "[k]eep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." The JOHNSON & JOHNSON Defendants provide similar warnings on their website: "[f]or external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

164.    Upon information and belief, at all times herein mentioned, the JOHNSON & JOHNSON Defendants continue to represent on the labeling and in their marketing that Johnson's Baby Powder has "clinically proven mildness," is "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer reviewed studies."

165.    Upon information and belief, at all times herein mentioned, Defendants failed to inform customers and end users of the PRODUCTS of a known catastrophic health hazard associated with their use.

166.    Upon information and belief, at all times herein mentioned, Defendants procured and disseminated false, misleading, and biased information regarding the safety of the PRODUCTS to the public and used influence over governmental and regulatory bodies regarding talc.

167.    Upon information and belief, as a direct and proximate result of Defendants' calculated and reprehensible conduct, Plaintiff suffered catastrophic injuries and damages, namely ovarian cancer, which required surgeries and treatments.

e.    ***IMERYS Failed to Warn Consumers of the Dangers of Talc Use***

168.    On information and belief, at all relevant times alleged herein, IMERYS TALC AMERICA, INC., mined, manufactured and sold talc to the J&J Defendants for sale to the public.

169.    At all times herein mentioned, the talc mined, extracted, sorted, milled, processed, treated, formulated, packaged, shipped, supplied, sold, marketed and distributed by IMERYS to the JOHNSON & JOHNSON Defendants for sale to the public was inherently and extremely dangerous in that, as set forth in detail above, it causes cancer in humans.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 48**

170.    On information and belief, at all relevant times alleged herein, the J&J Defendants then packaged and sold said talc in the PRODUCTS they sold to consumers, and IMERYS knew that consumers of the PRODUCTS were using it to powder their perineal regions.

171.    On information and belief, the PRODUCTS had potential risk and side effects that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of the manufacture, distribution and sale.

172.    On information and belief, the potential risks and side effects presented a substantial danger when the PRODUCTS were used or misused in an intended or reasonably foreseeable way.

173.    On information and belief, ordinary consumers would not have recognized the potential risks and side effects described herein.

174.    Upon information and belief, IMERYS actively participated in the design, development, and formulation of the PRODUCTS.  IMERYS is the world's largest talc producer and engages in the development, formulation, treatment, and promotion of talc for specific use in the PRODUCTS.  IMERYS has represented publicly the following:

- IMERYS spearheads talc milling technology, a complex process where the methods used depend both on the ore type and the final application. To obtain exactly the right particle size and top cut for a given application, we use a variety of techniques including compressed air, steam and impact milling - many of which have been developed in-house. Median particle sizes can range from less than 1 micron to 15 microns, and top cuts from 6 microns to over 100 microns.

- IMERYS implements specific treatments to the talc used in the PRODUCTS by milling, sorting, heating, grinding, and works directly with the JOHNSON & JOHNSON Defendants on formulations ("…applications specialists work directly with customers on their formulations.") http://www.imerystalc.com/content/corporate/AboutImerysTalc/Expertise_and_quality/Expertise/index.php

- IMERYS uses sorting and milling technologies to process talc, laser and image analysis technology, friction sorting, flotation techniques, drying, crushing grounding and micronizing;

44
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 49**

- IMERYS specifically promotes its talc for use in body powders and engineers it processing so that the Talc retains perfume ("…surfaces of the talc platelets retain the perfume with the minimum loss of potency.")

- IMERYS employs end-market specialists to pilot each market sector to match the right talc to the right application and leads its products to new innovations….

- IMERYS employs experts from the specialist markets it serves and provides technical expertise, collaborating on research projects, and supports the JOHNSON & JOHNSON Defendants in their product development and marketing efforts;

- Working at our technical centers in San José and Toulouse, our R&A teams focus on finding new applications for talc and new formulations to improve existing applications; formulation studies for customers; and fundamental research.

- IMERYS works with the JOHNSON & JOHNSON Defendants to develop new process technologies for its products;

- IMERYS collaborates with the JOHNSON & JOHNSON Defendants on research to find new applications for its products;

- IMERYS employs teams to find new applications for talc, conducts formulation studies for customers, and conducts fundamental research concerning Talc.

175.    Plaintiff is informed and believes, and based thereon alleges that at all times herein mentioned, IMERYS failed to adequately warn that its talcum powder PRODUCTS presented substantial dangers and risks, which would not have been recognized by ordinary consumers when used in an intended or reasonably foreseeable way, as evidenced through the following conduct:

- Through its mining, extraction, sorting, milling, processing, treating, formulating, packaging and manufacture of the talcum powder that comprises the PRODUCTS, IMERYS had a significant role in creating the finished PRODUCTS, and did not actually or reasonably rely on the J&J Defendants to convey warnings to end users, and any such reliance would have been unjustified.

- IMERYS did not take the additional steps it should have, including inquiring about the J&J Defendants' warning practices, to ensure that warnings were communicated to consumers.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 50**

- IMERYS ignored known facts that would provide notice of a substantial risk that the J&J Defendants might fail to warn consumers of the risks of talcum powder exposure, and those warnings might fail to reach consumers.

- IMERYS knew there was a substantial likelihood that the J&J Defendants would not convey the necessary or adequate warnings or information to ultimate consumers of talc PRODUCTS.

- IMERYS knew the J&J Defendants were not conveying such warnings or information to consumers, and that said Defendants' economic motivations were such that they had an incentive to withhold necessary information about talcum powder because warnings would make the products containing talc less attractive to consumers.

176.    Plaintiff is informed and believes, and based thereon alleges that at all times herein mentioned, IMERYS could and should have shared its superior knowledge and information about the dangers involved in the use of the talcum powder with the J&J Defendants and could and should have warned said Defendants and the public of the risks of harm.

177.    According to IMERYS'S website (http://www.imerystalc.com/) talc is used in agriculture, ceramics, cosmetics, food, paints and coatings, paper, pharmaceuticals, plastics, and rubber products, and for each broad category of applications IMERYS manufactures and markets talc products with unique features, formulations and physical properties which are designed for specific uses within those categories. IMERYS'S subjective plan of milling, treating and formulating its Talc products for use in the JOHNSON & JOHNSON Defendants' PRODUCTS constitutes a design. The Talc product produced by IMERYS is of common experience, encountered generally in everyday life, and a product on which a jury can rely on its own expectations of safety, and it failed to perform as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

178.    The talc product sold by IMERYS is inherently dangerous for perineal application, is not substantially changed during the manufacturing of the finished products sold by the JOHNSON & JOHNSON Defendants to consumers, and IMERYS had more than a limited role in creating the finished product and the PRODUCTS.  IMERYS did not have to guess or speculate about the type of use to which its talc product would be put, but rather IMERYS was aware of and intended that the talc product supplied

would be used in the manner in which it was actually used. The talc products supplied by IMERYS were specifically designed to meet the needs of the JOHNSON & JOHNSON Defendants.

179.    The talc product designed and sold by IMERYS is itself harmful and, without change in its composition, remains so when incorporated into the PRODUCTS and, renders the PRODUCTS into which it is incorporated harmful, contrary to ordinary consumer expectations.  The JOHNSON & JOHNSON Defendants did not significantly alter the IMERYS talc product. It is not just a design defect in the manufactured end product that caused the injury, but the defective nature of the IMERYS talc product contained in the PRODUCTS.

180.    Upon information and belief, at all times herein mentioned, the talcum powder mined, extracted, sorted, milled, processed, treated, formulated, packaged, shipped, supplied, sold, marketed and distributed by IMERYS to the JOHNSON & JOHNSON Defendants for sale to the public was not substantially changed during the manufacturing of the finished PRODUCTS, and IMERYS had a significant role in creating the finished PRODUCTS.

181.    Upon information and belief, IMERYS actively participated in the design, development, and formulation of the PRODUCTS.  Specifically, as stated on IMERYS'S website www.imerystalc.com, IMERYS is the world's largest talc producer and represents on its website the following:

**From mine to market**

**Sorting**

Sorting the different talc ores according to their talc content and brightness is a key phase of the production process. Techniques include state-of-the-art laser and image analysis technology, friction sorting or flotation techniques. The ores are then dried, crushed, ground and micronized.





COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 52**

**Milling**

Imerys spearheads talc milling technology, **a complex process** where the methods used depend both on the ore type and the final application. To obtain exactly the right particle size and top cut for a given application, we use a variety of techniques including compressed air, steam and impact milling - many of which have been developed in-house. Median particle sizes can range from less than 1 micron to 15 microns, and top cuts from 6 microns to over 100 microns.



**Treated talcs**

Certain grades of talc are treated, e.g. amine-coated talcs for fertilizers; silane-coated talcs for the rubber industry; and cationic talcs for pitch control in papermaking. For the cosmetics and pharmaceuticals industries, talcs are heat-treated to decontaminate them.



*See* http://www.imerystalc.com/content/corporate/About_talc/Extraction_and_processing/.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 53**

**Formulating for our customers**

Our applications specialists work directly with customers on their formulations. Existing formulations are improved and rendered more cost-effective, or replaced by more advanced solutions. Every year, we carry out more than a hundred formulation studies at our research and development facilities in Denver and Toulouse and help customers achieve their performance objectives while saving them valuable time.

**Formulating for our customers**

Our applications specialists work directly with customers on their formulations. Existing formulations are improved and rendered more cost-effective, or replaced by more advanced solutions. Every year, we carry out more than a hundred formulation studies at our research and development facilities in Denver and Toulouse and help customers achieve their performance objectives while saving them valuable time.

*See* http://www.imerystalc.com/content/corporate/AboutImerysTalc/Expertise_and_quality/Expertise/index.php.

**Body powders & Creams**

Imerys talcs make excellent body powders and fragrance carriers for scented powders…

**Baby and Body Powders**

With their soft, silky feel, Imerys talcs make excellent body powder. Applied after bathing, talc dries the skin, preventing chafing, and gives a pleasant, soothing, cool sensation.
Imerys talcs are excellent fragrance carriers for scented body powders. The surfaces of the talc platelets retain the perfume with the minimum loss of potency.

*See* http://www.imerystalc.com/content/bu/Cosmetics/Applications/Body_powder_&_creams/america.php.



49

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 54**

**A team of experts at your service**

Good understanding of each market segment is vital to matching the right talc to the right application.
At Imerys Talc, we have end-market specialists on board who pilot each market sector, leading the way with new innovations….
Working at state of the art R&D facilities and pilot plants in the United States, Europe, and Asia Pacific, our experts – many of whom have been recruited from the specialist markets we serve – are dedicated to:

- providing technical expertise and collaborating on research projects to support our customers,
- developing new process technology to increase efficiency and product quality,
- collaborating on research to improve products and find new applications

## A team of experts at your service

The world relies on our minerals, and we rely on one of our most important resources in finding, mining, processing and delivering them - our people.

Working at state-of-the-art R&D facilities and pilot plants in the United States, Europe, and Asia Pacific, our experts - many of whom have been recruited from the specialist markets we serve - are dedicated to:

- providing technical expertise and collaborating on research projects to support our customers,
- developing new process technology to increase efficiency and product quality,
- collaborating on research to improve products and find new applications.

Good understanding of each market segment is vital to matching the right talc to the right application.

At Imerys Talc, we have end-market specialists on board who pilot each market sector, leading the way with new innovations.

▶ Innovation
▶ Product stewardship

*See* http://www.imerystalc.com/content/corporate/About-Imerys-Talc/Expertise_and_quality/Expertise/index.php

182.    Because of the gravity of the risks posed by the talc involved and the severity of the harm to consumers, and because of its unique and sophisticated knowledge of the dangers inherent in its talcum powder, IMERYS could and should have taken additional steps, such as inquiring about the JOHNSON & JOHNSON Defendants' warning practices, to ensure that warnings were communicated to consumers.

183.    Upon information and belief, at all times herein mentioned, IMERYS had the legal right to issue notices regarding the safe use of the JOHNSON & JOHNSON Defendants' talc products, including end uses of the products.  Upon information and belief, at all times herein mentioned, IMERYS also had the legal right to refuse to sell talc to the JOHNSON & JOHNSON Defendants, if the JOHNSON & JOHNSON Defendants' use was improper, unsafe or unlawful.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 55**

184. Upon information and belief, however, for twenty-five years, IMERYS disregarded the facts and evidence it had compiled internally regarding the carcinogenicity of talc, as detailed herein, and never exercised its right to refuse to sell talcum powder to the JOHNSON & JOHNSON Defendants.

185. Upon information and belief, in 2006, when IMERYS added a warning to its talcum powder label, the company still never required the JOHNSON & JOHNSON Defendants to convey the same or a substantially similar warning to end users of the product, even though IMERYS knew there was a substantial likelihood that the JOHNSON & JOHNSON Defendants would not convey the necessary or adequate warnings or information to ultimate consumers of talc, and even though it knew in 2006, as discussed herein, of the potential for talc producers to be liable in product liability litigation in the United States.

186. Upon information and belief, at all times herein mentioned, IMERYS could and should have shared its superior knowledge and information about the dangers involved in the use of the talcum powder with the JOHNSON & JOHNSON Defendants and could and should have warned said Defendants and the public of the risks of harm.

187. As a direct and proximate result of IMERYS' calculated and reprehensible conduct, Plaintiff suffered catastrophic injuries and damages, namely ovarian cancer, which required surgeries and treatments.

f. *The JOHNSON & JOHNSON DEFENDANTS and IMERYS Conspired to Conceal the Dangers of Talc*

188. Upon information and belief, the JOHNSON & JOHNSON Defendants and IMERYS and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated and conspired among themselves, in the State of California, to cause injuries, diseases, and/or illnesses by exposing consumers and Plaintiff to the harmful and dangerous PRODUCTS. The JOHNSON & JOHNSON Defendants and IMERYS knowingly agreed, contrived, confederated and conspired to deprive Plaintiff of the opportunity of informed free choice as to whether to use the PRODUCTS or to expose themselves to the dangers associated with them. The JOHNSON & JOHNSON Defendants and IMERYS committed the above-described wrongs by willfully misrepresenting and suppressing the

truth as to the risks and dangers associated with the use of the talcum powder contained within the PRODUCTS.

189. Upon information and belief, in furtherance of said conspiracies, for decades the JOHNSON & JOHNSON Defendants and IMERYS individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports which clearly indicated that ordinary and foreseeable use of their PRODUCTS by women is unreasonably dangerous, hazardous, deleterious to human health, carcinogenic, and potentially deadly.

190. Upon information and belief, in furtherance of said conspiracies, the JOHNSON & JOHNSON Defendants and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to them, individually, jointly, and in conspiracy with each other, wrongfully, fraudulently, willfully and maliciously agreed among themselves to withhold, conceal and suppress medical information regarding the increased risk of ovarian cancer, as set out hereinabove. Upon information and belief, in furtherance of said conspiracies, the JOHNSON & JOHNSON Defendants and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to them, individually, jointly, and in conspiracy with each other, caused to be released, published and disseminated medical and scientific data, literature, and test reports containing information and statements regarding the risks of ovarian cancer which the JOHNSON & JOHNSON Defendants and IMERYS knew were incorrect, incomplete, outdated, and misleading. Upon information and belief, specifically, through the CTFA, the JOHNSON & JOHNSON Defendants and IMERYS collectively agreed to release false information to the public regarding the safety of talc on July 1, 1992; July 8, 1992; and November 17, 1994. Upon information and belief, in a letter dated September 17, 1997, the JOHNSON & JOHNSON Defendants and IMERYS were criticized by their own toxicologist consultant for releasing this false information to the public, as stated hereinabove, yet nothing was done by the JOHNSON & JOHNSON Defendants and IMERYS to correct or redact this public release of knowingly false information.

191. Upon information and belief, in furtherance of said conspiracies, the JOHNSON & JOHNSON Defendants and IMERYS, despite the medical and scientific data, literature, and test reports possessed by and available to them, individually, jointly, and in conspiracy with each other, by these

52
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 57**

false and fraudulent representations, omissions, and concealments, intended to induce Plaintiff and others to rely upon false and fraudulent representations, omissions and concealments, and to continue to expose themselves to the dangers inherent in the use and exposure to the PRODUCTS.

192.    Upon information and belief, individually and in concert with each other, the JOHNSON & JOHNSON Defendants and IMERYS participated in a common plan to commit the torts alleged herein, and each acted tortiously in pursuance of the common plan to protect and promote the health and safety of talc use, to the known detriment of the public, including Plaintiff.

193.    Plaintiff reasonably and in good faith relied upon false representations, omissions, and concealments made by the JOHNSON & JOHNSON Defendants and IMERYS regarding the nature of the PRODUCTS, and as a result suffered the injuries and damages alleged herein.

194.    Defendants and IMERYS conspired and entered into the aforementioned agreements in the State of California, aided and abetted each other, and engaged in the aforementioned acts in furtherance of their conspiracy, joint venture and agreements together with each other in California, and as a result of the foregoing conduct in furtherance of their conspiracy, joint venture and agreements, and aiding and abetting each other, each of them is derivatively liable for the conduct of the others in California.

195.    As alleged in this Complaint, the term "talcum powder products" or "PRODUCTS" refers to Johnson's Baby Powder and Shower to Shower products and all constituent elements of those products, including talc, asbestos, fibrous talc, Cadmium, Cobalt, Chromium, Copper, Iron, Manganese, Nickel, and other constituent and related elements and fibers contained within."

g.    *Defendants concealed and failed to warn about the dangers posed by asbestos in the talcum powder products*

196.    Plaintiff alleges that the talcum powder products mined, milled, imported, designed, manufactured, marketed, labeled, supplied, distributed, sold and otherwise placed in the stream of commerce by Defendants and IMERYS contained asbestos, including asbestos and asbestiform fibers, e.g., tremolite, actinolite chrysotile, non-platy and fibrous talc and other carcinogens, which Plaintiff used and was exposed to, and that Defendants failed to warn the public, including Plaintiff, about the fact that the talcum powder products contained such carcinogenic substances.

197. Defendants and IMERYS engaged in wrongful conduct and were negligent and created a dangerous and unreasonable risk of harm to others, including Plaintiff, by mining, milling, processing, supplying, distributing, designing, manufacturing, and selling the talcum powder products which contained asbestos which Defendants and IMERYS knew or should have known was dangerous and posed a substantial risk of harm to others, including Plaintiff.

198. Title 21, Section 740.1(a) of the Code of Federal Regulations states: "The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." 21 C.F.R. § 740.1(a). Plaintiff alleges that Defendants violated this law and that the violation was a substantial factor in bringing about harm to Plaintiff. The label for the talcum powder product did not provide any warning regarding the health hazards that were or may be associated with the product, including the health hazards associated with talc exposure and/or exposure to asbestos.

199. Geologists, Defendants, CTFA—and their suppliers, experts, agents and advisors—have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800s, note the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.

200. Defendants have long employed and/or consulted with doctors, scientists, geologists, mineralogists and toxicologists, and that they have long maintained extensive medical and scientific libraries and archives containing materials relating to the health hazards of talc and the presence of asbestos and asbestiform talc fibers in talc and talc deposits.

201. Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel and arsenic. Within the next several decades, a growing body of medical and scientific literature demonstrated that direct and secondary exposure to talc, including asbestos-containing talc, was hazardous to exposed persons' health in that it could cause lung disease, cancer and death.

202.   Defendants and their employees, agents and/or suppliers were members of the National Safety Council. In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45% talc and 45% tremolite.

203.   In an October 15, 1957 report, the JOHNSON & JOHNSON Defendants were informed that their Italian talc source contained amphiboles and other contaminates. The report also informed Defendant Johnson & Johnson that the talc contains "about 10 per cent [sic] fibrous or acicular particles."

204.   A May 9, 1958 report to the JOHNSON & JOHNSON Defendants informed them that the "8 to 10 per cent of nonplaty talc in the Italian material is presumed to be derived from tremolite or enstatite…. The Italian No. 1 talc contains from less than 1 per cent [sic] to about 3 per cent [sic] of contaminates. The contamination is natural and consists mostly of carbonate with minor amphibole and rare accessory minerals…. The amphibole component has been established to be the variety tremolite."

205.   In November 1967, Bill Ashton of Defendant Johnson & Johnson wrote a memo explaining that "the product is at least 93% talc plus 3-5% Dolomite and 1% or less of Tremolite."

206.    In 1968, a study presented at the American Industrial Hygiene Conference & Exposition and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a…fiber content…averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits…Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." L. J. Cralley, et al., Fibrous and Mineral Content of Cosmetic Talcum Products, 29 AM. IND. HYG. ASSOC. J. 350-354 (1968).

207.   A 1976 follow-up study conducted by researchers at Mount Sinai Hospital in New York concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc…We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." Rohl A.N., et al., Consumer Talcums and Powders: Mineral and Chemical Characterization, 2 J. TOXICOL. ENVIRON.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 60**

HEALTH 255-284 (1976). The Mount Sinai study results were published by various newspapers, including the New York Times and the Washington Post.

208.    In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association revealing that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile. This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits. Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content. Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public.

209.    On April 9, 1969, Bill Ashton wrote a memorandum to his superiors, including Dr. Gavin Hildick-Smith, about Tremolite in talc. Mr. Ashton wrote: "we have to firm up the position of the Company should have on the presence of the mineral Tremolite in talc… it is normal to find different levels of Tremolite in many U.S. talcs…. Historically, in our Company, Tremolite has been bad because it has needle type crystals. Our position has been that these can stand on end, penetrate the skin, and cause irritation; consequently, talcs exceeding trace contents have never been approved…. Unfortunately, Tremolite has different varieties and can be easily confused with other members of the mineral calls into which it falls… Some varieties of it match asbestos…. The question is… How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"

210.    In the early 1970s, the FDA began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, IMERYS and the CTFA, an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products, such as Defendants' products.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 61**

211.  In June of 1971, The United States Environmental Protection Agency issued a press release stating that "preliminary studies done for EPA at the Mt. Sinai School of Medicine on two different brands of baby powder found asbestos fiber content ranging from 5 to 25 percent."

212.  On June 29, 1971 Johnson & Johnson responded to the EPA press release with one of their own, stating "Our fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by Johnson & Johnson."

213.  In a memorandum of meeting dated July 8, 1971, documenting a meeting between FDA and Johnson & Johnson, an FDA official recorded Johnson & Johnson describing "the results from X-ray diffraction examination of Vermont talc. These results indicated that this talc contains essentially no anthophyllite and only minor amounts (below 1%) of tremolite and actinolite, or in other words contains less than 1%, if any, asbestos particles."

214.  A July 29, 1971 Johnson & Johnson memorandum with the subject "Talc/Asbestos" explains that the "talc used in JOHNSON'S Baby Powder is obtained from a selected mine in Vermont where the ore consists mainly of platy talc with only trace amounts of fibrous minerals (tremolite/actinolite)."

215.  On November 10, 1971 Dr. Arthur M. Langer, Associate Professor, Mineralogy at the Mount Sinai School of Medicine wrote Dr. Gavin Hildick-Smith of Johnson & Johnson regarding the analysis of tissue samples from the Tenvous Institute for Cancer Research that Dr. Langer had done. Dr. Langer wrote, "In respect to the Tenovus samples that were sent to us, we made the following observations… We assume that the particles were talc, or rather, were consistent with talc. We also got a few surprises in that we observed some chrysotile asbestos to be present in the tissue as well…. We have also analyzed one of your talc samples in some detail. In addition to the normal platy talc present, we have observed many 'fibrous talcs' as well…. We also observed trace amounts of chrysotile asbestos only when the talc was sonified and markedly dispersed."

216.  Contemporaneously, evidence began to emerge from testing conducted by various regulatory agencies revealing that asbestos was being found in food, beer and drugs, including intravenously injected medicines. In 1972, and later in 1973, the FDA filed notices of proposed rulemaking

requiring talc used in food, food packing and drugs to be asbestos-free. These were some of the same grades of talc used and supplied by Defendants.

217.    In this timeframe, on October 27, 1972, Walter C. McCrone Associates, Inc., a laboratory hired by Johnson & Johnson to test its talc, reported to the JOHNSON & JOHNSON Defendants that "A few tremolite rods were observed in both samples."

218.    In a November 29, 1972 memorandum on "Antagonistic Personalities," Dr. Gavin Hildick-Smith wrote that the "start of the attack on talc originated in England at the Tenovus Research Institute in Cardiff." Dr. Langer of Mt. Sinai School of Medicine was listed as an antagonistic personality who "is a microscopist who visually identifies chrysotile in most samples of talc that he examines…"

219.    In 1972, scientists at the University of Minnesota tested the JOHNSON & JOHNSON Defendants' Shower to Shower product. The University of Minnesota scientists reported that "numerous examples of fibrous structures were seen…. Three clear examples were found of serpentine material and which gave perfect chrysotile patterns." The scientist noted that the sample "contained incontrovertible asbestos."

220.    On February 20, 1973, T.H. Shelley, Ph.D., Director, Central Research Laboratories at Johnson & Johnson wrote a memorandum to his colleges "concerning Professor Pooley's process to remove tremolite from talc." Dr. Shelley noted, "This could be a valuable patent and we believe it should be actively pursued…. For your information, several of the U.S. industrial talc companies are very concerned about the presence of tremolite in their industrial talc…. It is quite possible that eventually tremolite will be prohibited in all talc…"

221.    The next month, Dr. Shelley changed his mind regarding the patent on the process to remove tremolite from talc. On March 30, 1973, Dr. Shelley wrote a note to his colleges: "we will want to carefully consider the Pooley patents re asbestos in talc. **It's quite possible that we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know.**"

222.    On April 26, 1973, D. R. Petterson of Johnson & Johnson wrote an internal memorandum on the Windsor Minerals mine. The memo explained, "We believe this mine to be very clean; however, we are also confident that fiber forming or fiber type minerals could also be found. The usefulness of the

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 63**

'Clean Mine' approach for asbestos only is over…. The current medical research is confirming that it is particle shape, not chemical substance which is harmful as such fiber-like minerals will be suspect." The memorandum continued, "As for Baby Powder, the entire thrust of our communications with the FDA has concentrated on asbestos as harmful fiber-like material. Sophisticated techniques have been proposed to make sure that fiber-form materials present in samples were identified as being asbestos. The implication is that all other fiber-forms, if present, were talc or other minerals and these were safe. This posture will no longer be satisfactory…. Our Baby Powder contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of tremolite or actinolite are identifiable (Optical Microscope) and these might be classified as asbestos fiber." The memo also noted that, "It should be cautioned, however, that no final product will ever be made which will be totally free from respirable particles" and that "Corn Starch is obviously another answer."

223. On May 16, 1973, Johnson & Johnson wrote a memorandum on a new method of detecting asbestos in talc using x-ray Diffraction developed by Dr. Pooley. Johnson & Johnson noted that "Dr. Pooley has developed two techniques for preconcentration of chrysotile and tremolite in talc followed by X-ray diffraction analysis…. This technique has not been written up yet, but evidently when applied to Vermont talc, 0.05% of tremolite-type is found. **The limitation of this method is that it may be too sensitive.**" (emphasis added).

224. On October 23, 1973, Johnson & Johnson wrote that a proposal of a method to analyze talc would show that their talc was acceptable, "However, if they change the method, we may have problems."

225. In 1973, the CTFA created a talc subcommittee and the Scientific Advisory Committee to develop a testing methodology for detecting asbestos in talc. Initially, the CTFA designated a group of its members to tests talc grades used in talcum powder utilizing the methodology proposed by the FDA in its notice of rulemaking. Six samples of talc used in commercially available talcum powders, plus one talc sample purposely spiked with tremolite and chrysotile, were circulated among the members, including representatives of Defendants. Of the eight participating members, four found asbestos in every sample, three did not find asbestos in any sample (including the spiked sample), and one found asbestos only in the spiked sample. In conclusion, all members agreed that the best and most reliable method of detecting asbestos in talc is not optical microscopy, but rather TEM and electron diffraction. The same members,

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 64**

however, dispensed with this analytical method, claiming TEM and electron diffraction equipment was too expensive, despite Defendants then owning or having unfettered access to same.

226.    From there, the difference between what Defendants and the CTFA knew diverged from what they were representing to the FDA. Defendants, the CTFA and others in the industry knew that there was no such thing as asbestos-free talc—only talc in which asbestos could not be detected using the prevailing, most economic analytical methodology, XRD, which at the time could not accurately identify chrysotile asbestos in talc, nor detect tremolite asbestos contamination levels below 2-5%.

227.    On January 16, 1974, Dr. Gavin Hildick-Smith wrote a memo to file documenting a meeting between Johnson & Johnson and FDA regarding "Talc/Asbestos." The memo notes that Dr. Eiermann, Director, Division of Cosmetics Technology at FDA, a former J&J employee, "has some reservation about allowing 1% chrysotile." **Johnson & Johnson told FDA** that their "very preliminary calculation indicates **that substantial asbestos can be allowed safely in a baby powder**." The memo documents that Johnson & Johnson told FDA "that if the results of any scientific studies show any question of safety of talc, Johnson & Johnson will not hesitate to take it off the market." (emphasis added).

228.    On March 5, 1974, Bill Ashton of Johnson & Johnson wrote a "Research Proposal" on "Talc Alternatives." Mr. Ashton wrote, "During the past couple of years our need for a non-talc dusting powder base has increased as a direct result of the talc/asbestos controversy… For defensive reasons, in the event that talc must be removed from the market, the development of a product based on ordinary cornstarch (Formula 31) is being finalized."

229.    In a March 1974 confidential memorandum, Windsor Minerals, Inc. was informed by a scientist at Dartmouth College that "Actinolite is the dominate fiberform amphibole in the ore and talc product provided by Windsor Minerals. Small amounts of anthophyllite may be present."

230.    On May 14, 1974, Vernon Zeitz, the Manager of Research and Development at Windsor Minerals Inc., wrote a report that was sent to G. Lee at Johnson & Johnson. Mr. Zeitz stated, "The use of citric acid in the depression of chrysotile asbestos and other mineral species has been developed at Windsor Minerals in response to the potential need for a means to exclude extremely low levels of these contaminants from the finished product of the beneficiation process. The use of these systems is strongly urged by this writer, to provide the protection against **what are currently considered to be materials**

**presenting a severe health hazard and are potentially present in all talc ores used at this time**.” (emphasis added).

231.    On September 6, 1974, Johnson & Johnson sent FDA a letter that said “In an effort to answer the question about the required degree of sensitivity of the method of assay for asbestos in talc, our statistical group has made an estimation of a theoretical safe level of asbestos fiber in a baby powder utilizing the official TLV for asbestos and the data on dusting of baby powder. The calculation shows that a substantial safety factor can be expected with talc containing 1% w/w asbestos fibers.”

232.    In an October 15, 1974 memorandum, Johnson & Johnson reported on a meeting of Johnson & Johnson managers: “Grave concern was expressed by the meeting with the inclusion of TEM as an alternative follow-up to Optical Dispersion… G. Lee would convene a separate meeting with Drs. Nashed and Rolle to resolve the difficulties surrounding the TEM recommendation.”

233.    A February 13, 1975 Johnson & Johnson internal memorandum authored by G. Lee documents a meeting the CTFA, represented by G. Lee and Dr. Rolle of Johnson & Johnson, had with FDA. The CTFA and Johnson & Johnson repeated its assertion to FDA that 1% asbestos could be safety included in talcum powder based on Johnson & Johnson’s calculation. As G. Lee of Johnson & Johnson documented it, FDA responded that the “calculation was foolish since **no mother was going to powder her baby with 1% of a known carcinogen**...” (emphasis added).

234.    On March 3, 1975, G. Lee of Johnson & Johnson wrote a “Strictly Confidential” memorandum on talc safety studies. G. Lee wrote, “Our current posture with respect to sponsorship of talc safety studies has been to initiate studies only as dictated by confrontation… The principal advantage for this operating philosophy lies in the fact that we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing… An alternative philosophy has been presented… We would carry out other reasonable safety studies to continue our contradiction of generated negative data and to anticipate questions on safety which will probably be raised. This philosophy offers maximal leverage for defending the product…”

235.    On November 5, 1975, Walter C. McCrone Associates, Inc. sent a letter to Windsor Minerals Company reporting on “a series of talc ore samples which [McCrone had] analyzed for [Windsor

Minerals]." The letter informed Windsor Minerals that amphibole particles were found in the samples. The letter explained that "Some of them seemed rather high, one had 10 and one had 9 amphiboles."

236. On November 24, 1976, Bill Ashton wrote to George Lee about a "disturbing proposal request" by FDA. Mr. Ashton wrote, "As I have pointed out many times, there are many talcs on all markets which will be hard pressed in supporting purity claims, when ultra sophisticated assay separation and isolation techniques are applied. Chances are that this FDA proposal will open up new problem areas with asbestos and talc minerals."

237. Defendants and third parties collectively met with and corresponded with the CTFA, as well as collectively met with the FDA, to individually and collectively advocate for the use of "voluntary" XRD testing of miniscule portions of the tons of talc to be used in consumer products. Defendants' "voluntary" method—that was developed collectively by Defendants and the CTFA and advocated to the FDA in lieu of regulations requiring asbestos labeling or warnings on talcum powder products—was inadequate because levels of asbestos contamination in talc commonly fell below the detection limit of XRD. Defendants and the CTFA also knew that asbestos contamination was not uniformly distributed, such that the miniscule amounts tested would not reveal the true level of contamination in talc products, such as those to which Plaintiff was exposed. In support of their voluntary XRD methodology, which was finally published in 1977, the CTFA produced letters to the FDA written by its members, including Defendants, identifying tests conducted showing talcum powder products did not contain asbestos. The CTFA, Defendants and other talc product producers, however, never informed the FDA of the hundreds of positive tests showing talc and talcum powders contained asbestos and other carcinogens. Defendants and the CTFA made and published representations claiming that their testing method was adequate, that they were ensuring that talcum powder products were safe, and that the talc reaching consumers was "safe," despite having substantial knowledge and evidence to the contrary. Defendants intentionally and knowingly did so to avoid FDA regulations that may have required them to place warnings regarding the asbestos content of their products, and thereby inform the public, including Plaintiffs, that talc-containing products contained asbestos.

238. The CTFA and Defendants have represented to various news media outlets and the public at large that their products are "asbestos-free," when, in fact, their products did test positive for asbestos

and those that did not were merely the result of inadequate and imprecise testing methods. "No asbestos detected" means something much different than "no asbestos," but due to Defendants' repeated conflation of the terms, the public has been led to erroneously believe talc products are safe.

239. Between 1970 and the 1990s, tests conducted by and on behalf of Defendants and the talc industry continued to show that talc and talcum powder products contained asbestos as well as other contaminates such as Cadmium, Cobalt, Chromium, Copper, Iron, Manganese, and Nickel. None of these positive tests have ever been produced or made known to any regulatory agency, and knowledge of their existence is only because of civil litigation.

240. Since at least 1979, Defendants have conducted a campaign to convince the public that their products are regulated by the FDA, that their tests are conducted pursuant to FDA regulations, and that talcum powder products are therefore safe. Nothing could be further from the truth: the FDA has never been assigned a budget by Congress to regulate cosmetics, including talcum powders. Defendants' concerns for the safety of their products have always been voluntary and under the auspices of the CTFA, a private industry group, that in its 40 years has only banned the use of 11 ingredients in all cosmetics ever sold in the United States.

241. Defendants, IMERYS, and the CTFA, collectively by their agreement and conspiracy, controlled industry standards regarding the testing, manufacture, sale, distribution and use of talcum powder products, and controlled the level of knowledge and information available to the public, including Plaintiff, regarding the hazards of exposure to carcinogens, including talc, asbestos, and fibrous talc. They also knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder products, including those to which Plaintiff was exposed.

242. Defendants, IMERYS and the CTFA, while cognizant of the aforementioned data, deliberately chose to ignore the health and safety issues raised in said data and embarked upon a plan of deception intended to deprive the public at large, including Plaintiff, of alarming medical and scientific findings, many of which remained in their exclusive possession and under their exclusive control.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 68**

243.    Defendants, IMERYS and the CTFA conspired and/or acted in concert with each other and/or with other entities through agreement and consciously parallel behavior: (a) to withhold from users of their products—and from persons who Defendants knew and should have known would be exposed thereto—information regarding the health risks of asbestos, talc, and other carcinogens contained in the PRODUCTS; (b) to eliminate or prevent investigation into the health hazards of exposure to asbestos, talc and other carcinogens in the PRODUCTS; (c) to ensure that asbestos-containing talc and talcum powder products became widely used in commerce, irrespective of the potential and actual risk of harm to the users and consumers from the asbestos, talc and other carcinogens therein; and (d) to falsely represent that talc and talcum powder products, including those of Defendants, were safe for use by consumers.

244.    Plaintiff reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by Defendants and their agent, the CTFA, regarding the hazards of talc and talcum powder products, including the failure to warn and disclose the fact that such products contained asbestos and other carcinogens, including talc itself, and was, therefore, deprived of an opportunity to make informed decisions concerning use of, exposure to and contact with said products.

245.    McCrone Associates, the laboratory selected by several talc producers—including Defendants—to analyze their products, was already using TEM for asbestos analysis. An article by McCrone and Stewart from 1974 describes the advantages of TEM for asbestos analysis and states that the TEM "only recently installed in our laboratory will undoubtedly be the ideal instrument for the detection and identification of very fine asbestos fibers."

246.    The CTFA "Method J4-1," published on October 7, 1976, states that TEM-SAED "offers greater sensitivity, but is not presented since it is unsuitable for normal quality control applications." The published method, rather, relies on XRD with "the level of detection of amphibole by this method [being] 0.5% and above." The CTFA met with and corresponded with Defendants and third parties, to individually and collectively advocate to the FDA for the use of inadequate XRD testing on miniscule portions of the tons of talc obtained from the mining sources to be used in the consumer products, followed by fewer "periodic" tests by TEM. This voluntary method was developed by CTFA, Defendants, and IMERYS and was advocated to the FDA by the CTFA, and Defendants and IMERYS in lieu of regulations requiring labeling and warnings on talcum powder products, even though the CTFA and Defendants knew that the

64

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 69**

J4-1 method would not reveal the true level of asbestos in the talc that reached consumers. In fact, the first "round robin" tests, which analyzed a "CTFA Tremolite-Spiked Talc," resulted in 6 of 7 participating laboratories failing to detect the tremolite.

247. In other words, 84% of the industry's laboratories failed to detect asbestos in a sample known to contain tremolite asbestos while using the CTFA's own J4-1 method. There is no evidence that the CTFA, IMERYS or Defendants ever shared this remarkable failure with the FDA or the public.

248. The FDA, and ultimately Plaintiff, directly and/or indirectly relied upon the CTFA's false representations regarding the safety of cosmetic talc. In fact, a FDA letter dated January 11, 1979, states "In cooperation with scientists from industry, our scientists have been making progress in the development of such regulatory methods." The continuing lack of FDA awareness regarding the CTFA's, IMERYS' and Defendants' misrepresentations and concealment was obvious seven years later. On July 11, 1986, in a response to a citizen petition to require an asbestos warning label on cosmetic talc, the FDA stated that an "analytical methodology was sufficiently developed" to ensure that "such talc [is] free of fibrous amphibole…" The CTFA's J4-1 method has continued for the past four decades to be the cosmetic talc industry's method for "ensuring" "asbestos-free" talc. The use of TEM, recognized by the CTFA as offering "greater sensitivity" for asbestos, continued to increase over the following decades as its advantages were applied to more matrices.

249. In 1990, Kremer and Millette published a TEM method for analysis of asbestos in talc with a theoretical detection limit of about 0.00005%. Despite such improvements in analytical techniques, the cosmetic talc industry continues, four decades later, to use and promote its antiquated and wholly inadequate J4-1 method.

250. In a March 25, 1992 interoffice memorandum titled "Cyprus Ore Reserves – Arsenic & Tremolite", Cyprus Industrial Minerals wrote: "Cyprus claims that there are no fibres in their cosmetic talc products and they work rigorously to ensure this. However, a recent paper published by Rutgers University workers, Alice Blount, suggests the presence of fibre in several cosmetic talcs, some of which might have been from Cyprus West Windsor material, which is a source of great concern to Cyprus management and potentially to their principal customer, Johnson & Johnson…. Vermont talcs are derived from altered serpentine – a natural host for asbestiform minerals. There is certainly visible tremolite and actinolite in

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 70**

specific zones of the Vermont deposits – fibrous tremolite was identified by the writer in exposures and corers at the East Argonaut and Black Bear mines. Cyprus staff report past tremolite from the Hammondsville and Clifton deposits."

251.    In 2009, FDA conducted an exploratory survey of marketed cosmetic-grade raw talc from four suppliers, including Defendants.  While the testing did not detect asbestos, FDA found this data informative, but added that "the results were limited by the fact that only four suppliers submitted samples and by the number of products tested. **They do not prove that all talc-containing cosmetic products currently marketed in the United States are free of asbestos contamination**." *See* JNJ000489048-54 [Emphasis added.]

252.    An October 7, 2013 marked-up version of Johnson & Johnson's Safety and Care Commitment website shows that the JOHNSON & JOHNSON Defendants knew that their baby powder had contained asbestos. The document states: "Our talc-based consumer products are ~~have always been~~ (we cannot say 'always') asbestos free, as confirmed by regular testing conducted since the 1970s." Comments on the document note "Even some of the studies we cite send mixed message. For example, Gertig et al concludes: 'Our results provide little support for any substantial association between perineal talc use and ovarian cancer risk overall; however, perineal talc use may modestly increase the risk of invasive serous ovarian cancers.'"

253.    Yet to present, Defendants continue to deny knowledge of talc contamination with asbestos or safety concerns. In response to a December 14, 2018 expose published by Reuters titled, "Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder," Johnson & Johnson's Chief Executive Alex Gorsky, said in an interview that "any suggestion that Johnson & Johnson knew or hid information about the safety of talc is false." Defendant Johnson & Johnson also took out a full-page ad in The New York Times and The Wall Street Journal which headlined, "Science. Not sensationalism." The ad asserted that J&J has scientific evidence its talc is safe and beneficial to use. "If we had any reasons to believe our talc was unsafe, it would be off our shelves."

254.    Asbestos and asbestiform talc are known carcinogens.  *See* IRAC Mongraph 100c 2012.

255.    IARC concluded that there is "*sufficient evidence* in humans for the carcinogenicity of all forms of asbestos (chrysotile, crocidolite, amosite, tremolite, actinolite and anthophyllite)."  Asbestos

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 71**

causes cancer of the ovary. *See* IRAC Mongraph 100c 2012. 210. The CTFA and Defendants, knowingly and intentionally released, published and disseminated invalid, inaccurate, outdated and misleading scientific data, literature and test reports containing misinformation and false statements regarding the health risks associated with the use of talc and talcum powder, including talc and talcum powder used in the production of products to which Plaintiff used and was exposed.

256. The CTFA, which was Defendants' agent, along with Defendants and IMERYS, suppressed, altered, changed, destroyed and/or revised reports, data, tests, studies and other documents regarding the potential presence of asbestos and other carcinogens in talc and talc-containing products, including Defendants' talc powder products to which Plaintiff was exposed. The conduct of Defendants, both acting individually and in concert with others, including the CTFA and IMERYS, was a substantial factor in causing harm to Plaintiff.

257. The conduct of Defendants, independently and collectively and through their agents, constitutes a pattern or practice of intentionally wrongful conduct and/or malice resulting in injuries to Plaintiff as alleged in this complaint.

h.    *Defendants' wrongful acts are indigenous to the State of California*

258. Defendants' wrongful acts are connected to California in that the PRODUCTS and/or talc (and constituents including asbestos fibers such as , tremolite, actinolite, as well as asbestiform fibers such as fibrous talc) intended for use in the PRODUCTS were analyzed, tested, marketed, advertised, distributed and sold in California and certified by IMERYS as free of asbestos and asbestiform fibers in California for sale throughout the United States.

259. At all pertinent times, the JOHNSON & JOHNSON Defendants were and continue to be connected to California through their predecessor ownership in California talc mines, mills and processing plants. The JOHNSON & JOHNSON Defendants originally sourced all raw talcum powder for Johnson's Baby Powder PRODUCTS from domestic mines located in California. California served as the exclusive source of talc for the JOHNSON & JOHNSON Defendants from the inception of its Johnson's Baby Powder PRODUCTS line until 1926. In 1926, JOHNSON & JOHNSON changed its sourcing of raw talcum powder from domestic mines located in California to talc sourced in Italy.

260.　In 1941, due to the outbreak of World War II and the attendant difficulties in procuring talcum powder from its Italian source, JOHNSON & JOHNSON returned to California for sourcing of its talc from approximately 1941 through 1946. After 1946, JOHNSON & JOHNSON returned to sourcing the raw talcum powder used in their PRODUCTS from Italy, specifically Italy's Val Chisone region and its associated mines.

261.　In 1971, California talc is again investigated by the JOHNSON & JOHNSON Defendants as a source for the PRODUCTS when Defendants began the process of evaluating and qualifying the Grantham Mine, located in the Death Valley region of California. The Grantham ore was considered as a potential source of raw talcum powder for use in its PRODUCTS despite the fact that it was shown to contain both tremolite and chrysotile.

262.　Tremolite, chrysotile, anthophyllite, other forms of asbestos and asbestiform minerals, as well as known carcinogens such as heavy metals (including nickel, hexa-valent chromium, cadmium, cobalt, copper, iron, and manganese), as well as arsenic, quartz, silica, and lead, were known by the JOHNSON & JOHNSON Defendants to be constituent minerals that were incapable of being wholly removed from the talcum powder which it used in the manufacture of its Baby Powder and Shower to Shower product lines.

263.　Scientific literature published as early as 1968 has revealed that many toxic metals commonly found in talc are known or possible carcinogens and include nickel, chromium and cobalt (Cralley, 1968; Rohl, 1976; Sunderman, 1978; Stohs, 1995; Hayes 1997; Gondal, 2012; and Rehman 2013.)

264.　Nickel and chromium are designated by IARC as known human carcinogens. Cobalt is designated by IARC as possibly carcinogenic to humans. (IARC 2006 and 2012.)

265.　For more than half a century the JOHNSON & JOHNSON Defendants in concert with IMERYS performed experimental analyses and studies detailing the presence, contamination levels, and inability to mitigate, the amounts of these carcinogens in the raw talcum powder used in the PRODUCTS.

266.　At all pertinent times, IMERYS (formerly known as Luzenac America), and/or its predecessors in interest, were engaged in the business of mining, milling, manufacturing, research and developing, processing and testing talc in California.

267. In 1919, the Inyo Talc Company began producing talc from a mine in Talc City, California, and processing the talc at a mill at Keeler, California. Inyo changed its name to Sierra Talc and in 1942 Sierra Talc expanded is talc production in California with the purchase of the Pacific Coast Talc, Bay Street Mill, in California. Sierra Talc then purchased Muroc Clay Company and the Randolph Street Mill, located in Los Angeles, California.

268. In 1953, Defendant opened the Panamint Mine in California which was in operation for over 30 years until its close in 1986.

269. In 1964, Cyprus Mines purchased Sierra Talc, and in 1973 the United Sierra Division became the Cyprus Industrial Minerals Company and was renamed Cyprus Industrial Minerals Corporation. Shortly thereafter, in 1974, Cyprus Industrial Minerals relocated its headquarters to Los Angeles, California. Cyprus subsequently became a major player in the market for talcum powder, logging production of 122,000 tons and revenues of $11 million in 1976.

270. In 1992, Rio Tinto purchased the talc assets of Cyprus Industrial Minerals, incorporating these assets as Luzenac America Incorporated. Included in these assets were the mines and processing facilities of Windsor Minerals, Inc. a former subsidiary of JOHNSON & JOHNSON, which maintained significant talc producing and milling assets located in Vermont and in California.

271. At all pertinent times, the JOHNSON & JOHNSON Defendants were and continue to be connected to California by and through their dealings, communications and contracts with IMERYS. JOHNSON & JOHNSON Defendants' relationship with IMERYS was specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein.

272. The JOHNSON & JOHNSON Defendants worked closely with IMERYS for the supply and testing of its PRODUCTS. IMERYS' nucleus of operations and control center for PRODUCT analysis and testing was its Corporate Research and Development Laboratory, which was at all relevant times based in San Jose, California. IMERYS tested the JOHNSON & JOHNSON Defendants' talc for asbestos and asbestiform talc fibers at their California facility knowingly using faulty test methods that had "detection limits" and as such could only vouch that asbestos was "not detected." And yet, IMERYS approved the respective talc samples despite IMERYS' knowledge of the presence of deadly asbestos fibers as well as asbestiform fibers and other harmful constituents in the talc.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 74**

273. IMERYS was complicit in exposing the general public, including Plaintiffs, to the PRODUCTS through the testing of talcum powder supplied to the JOHNSON & JOHNSON Defendants using a knowingly flawed, inaccurate and imprecise, methodology at its California Corporate Laboratory where research and development, analysis, testing and the approval of talc supplies for Defendants' PRODUCTS were conducted. IMERYS' California Corporate Laboratory was the quality control nerve center for the JOHNSON & JOHNSON Defendants' PRODUCTS.

274. The testing methodology employed by IMERYS in qualifying its raw talcum powder as "free of asbestos" is incapable of ensuring the absence of harmful asbestos and asbestiform talc fibers, and was developed by members of the industry, through the auspices of its trade group, the CTFA, as a means of avoiding more accurate, and precise testing protocols. To this day, IMERYS continues to use this flawed testing methodology in qualifying its ore as "free of asbestos".

275. IMERYS further tested the raw talcum powder supplied to the JOHNSON & JOHNSON Defendants through a second proprietary testing method developed by the JOHNSON & JOHNSON Defendants. Such testing is a pre-requisite to maintaining its status as a supplier of talc to the JOHNSON & JOHNSON Defendants.

276. Despite knowledge by the JOHNSON & JOHNSON Defendants that the testing methodology used in detecting and quantifying the level of asbestos and asbestiform fibers in the PRODUCTS was incapable of ensuring the complete absence of the same, the JOHNSON & JOHNSON Defendants have, and continue to, market their PRODUCTS as "free from asbestos and asbestiform fibers."

277. In addition to asbestos, the JOHNSON & JOHNSON Defendants knew or should have known that the talcum powder used in the PRODUCTS contained other harmful constituents, including arsenic, quartz, silica, and heavy metals such as nickel, cadmium, cobalt, copper, iron, manganese and chromium. The JOHNSON & JOHNSON Defendants' contracts, communications and business relationships with several testing laboratories in California were specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein. The JOHNSON & JOHNSON Defendants contracted with EXOVA Inc. in Santa Fe Springs, California and the RJ LEE GROUP in Berkeley, California to test for harmful carcinogens and other harmful constituents in the PRODUCTS. In

addition, Forensic Analytical located in Hayward, California also tested the PRODUCTS for the JOHNSON & JOHNSON Defendants.

278.   At all pertinent times, the JOHNSON & JOHNSON Defendants communicated with IMERYS' California Corporate Laboratory on asbestos testing methods and standards. As part of their agreements to test JOHNSON & JOHNSON'S PRODUCTS, IMERYS relied on testing by Intertek, a testing laboratory with several California locations including its North American Consumer Goods location in El Segundo, California.

279.   At all pertinent times, IMERYS' California Corporate Laboratory managers made presentations throughout California (among other places) promoting IMERYS' flawed testing techniques and methodologies at several industrial mineral conferences, including but not limited to the California Society of Cosmetic Chemists, the ASTM conferences and the Michael E. Beard Asbestos Conferences.

280.   The JOHNSON & JOHNSON Defendants and IMERYS worked in concert to obtain a favorable determination by the Cosmetic Ingredient Review that their talc was safe, despite evidence to the contrary.

281.   Further, the JOHNSON & JOHNSON Defendants and IMERYS have undertaken a concerted and extensive effort to influence both regulators and the prevailing body of scientific evidence that talcum powder PRODUCTS are not carcinogenic, and that they contain no other carcinogenic constituents such as asbestos and asbestiform fibers.  This effort has consisted of contracting with, and soliciting the input of, numerous California thought leader scientists to offer opinions, author peer-reviewed articles and supplemental analyses of the PRODUCTS in order to fend off negative publicity and government regulation aimed at mandating labeling requirements on cosmetic talcum powder PRODUCTS. The JOHNSON & JOHNSON Defendants' contracts, communications and business relationships with thought leaders and academic institutions in California were specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein.

282.   The JOHNSON & JOHNSON Defendants contracted with the noted California thought leader scientist Dr. Hoda Anton- Culver of UC Irvine and Dr. Dwight Culver in formulating a response to discredit a significant talc inhalation study undertaken by the NTP in 1992.  Dr. Dwight Culver, an occupational physician and consulting medical director to U.S. Borax (a subsidiary of Rio Tinto in Boron,

California), provided consulting services to the JOHNSON & JOHNSON Defendants, along with his wife, Dr. Hoda Anton-Culver, the Director of Epidemiology at the University of California-Irvine.

283. The JOHNSON & JOHNSON Defendants also contracted with California thought leader Professor Gordon E. Brown, Professor of Mineralogy and Geochemist at Stanford University, to refute and discredit the analysis of the JOHNSON & JOHNSON Defendants' PRODUCT samples tested by Dr. Lewin (see discussion below) who found Defendants' PRODUCTS contained asbestos.  The JOHNSON & JOHNSON Defendants continue to contract with Professor Brown as a thought leader consultant on a range of analyses and testing issues related to the safety of their PRODUCTS.

284. The JOHNSON & JOHNSON Defendants also employed California thought leader Dr. Donald Dungworth of the University of California-Davis as a consultant in order to prevent the NTP from classifying talc as a carcinogen. The JOHNSON & JOHNSON Defendants used Dr. Dungworth and his research in order to convince the NTP to disregard studies where rats and mice exposed to talc suffered from cancer and/or lung disease.

285. The JOHNSON & JOHNSON Defendants also sought the services of thought leader experts in occupational medicine, Dr. Clark Cooper and Dr. Irving Tabershaw, of the University of California Berkeley School of Public Health.  Drs. Cooper and Tabershaw operated a consulting business known as Tabershaw-Cooper Associates.

286.  The JOHNSON & JOHNSON Defendants sought to influence the work of the Stanford Research Institute ("SRI"), based at Stanford University in California, in order to achieve favorable regulatory decisions in the late 1970s. The U.S. National Institute for Occupational Safety and Health ("NIOSH") contracted SRI for assistance with an official "criteria document" on talc. Defendants were aware that any decision by NIOSH would be based largely on findings by SRI and so hoped to influence both. To that end, Defendants hosted a delegation from NIOSH and SRI at one of their facilities to convince them that their "cosmetic-grade" talc was free of asbestos and posed no health risks.

287.  At all pertinent times, the JOHNSON & JOHNSON Defendants have maintained and continue to maintain a substantial presence and a vested financial interest in California with the presence of ten locations across the State in Fremont, CA, Irvine, CA; Irwindale, CA; La Jolla, CA; Menlo Park, CA; Milpitas, CA; Sacramento, CA; San Diego, CA; South San Francisco, CA; and Vacaville, CA.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 77**

288. The JOHNSON & JOHNSON Defendants' California Innovation Center in Silicon Valley was recently created to develop relationships between the JOHNSON & JOHNSON Defendants, California scientists, and their respective companies in the Western United States.

289. The JOHNSON & JOHNSON Defendants' Research and Development laboratory in San Diego, known as JLABS, houses scientific development by "resident companies" in the health care, pharmaceutical, and consumer goods markets, in which the JOHNSON & JOHNSON Defendants invest, as a means to further establish relations with California and West Coast Scientists and Companies.

290. To expand their product lines even further in California markets, the JOHNSON & JOHNSON Defendants recently established JJDC, INC, an investment venture fund, to incubate and develop start-ups in California.

291. At all pertinent times, the JOHNSON & JOHNSON Defendants have maintained and continue to maintain an office in Sacramento, California dedicated to lobbying efforts encompassing, among other issues, Proposition 65 and the classifications of carcinogens, including talc used in Defendants' PRODUCT. The JOHNSON & JOHNSON Defendants' lobbying efforts in California were related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein. In the last fifteen years, the JOHNSON & JOHNSON Defendants spent over ten million dollars ($10,000,000) to influence the laws and regulations of the State of California.

292. At all pertinent times, California's Proposition 65 was of particular interest to the JOHNSON & JOHNSON Defendants, as labeling requirements on consumer goods flowing from the recognition of talcum powder as a carcinogen would have triggered labeling requirements on the JOHNSON & JOHNSON Defendants' Baby Powder and Shower to Shower PRODUCTS which it had sought to avoid since the early 1970's when the FDA first began considering labeling and regulation of talcum powder and talcum powder containing PRODUCTS.

293. With full knowledge of the ultra-hazardous nature of the PRODUCTS, the JOHNSON & JOHNSON Defendants marketed, sold, promoted, and distributed these PRODUCTS across the country through a nationwide distribution network with locations in; New Brunswick, New Jersey; Savannah, Georgia; Chicago; Illinois; Los Angeles, California; and Dallas, Texas.

294.    At all pertinent times, the JOHNSON & JOHNSON Defendants targeted California in their advertising and marketing strategies and reaped significant profits from purchasers of their PRODUCTS. The JOHNSON & JOHNSON Defendants' contracts, communications and business relationships with several advertising, marketing, media and public relations firms in California were specifically related to Defendants' talc and the PRODUCTS, and thus is and was specific to the issues herein. The JOHNSON & JOHNSON Defendants implemented an aggressive strategy to expand their PRODUCT sales specifically to Hispanic women. With the nation's largest Hispanic population, California and specifically California Hispanic women were and continue to be an important strategic market for Defendants' PRODUCTS.

295.    At all pertinent times, the JOHNSON & JOHNSON Defendants hired, supervised and directed third party media and public relations companies with offices in both Northern and Southern California to create sophisticated Spanish-language newspaper, magazine, billboard, radio, and television marketing and advertising campaigns to promote the PRODUCTS specifically to California Hispanic women.  The JOHNSON & JOHNSON Defendants' campaign was so successful that Defendants created and produced a Spanish-language Johnson's Baby Powder bottle for placement on, among other locations, California grocery, pharmacy and big-box store (Target, Walmart, Kmart) shelves through-out the State.

296.    At all pertinent times, the JOHNSON & JOHNSON Defendants paid substantial funds to purchase California media from California advertising and marketing agencies to target the women of California, and specifically target the Hispanic women of California, into purchasing their Baby Powder PRODUCTS while knowingly concealing the fact that the PRODUCTS contained carcinogenic substances talc, asbestos and asbestiform fibers which posed a high risk of ovarian cancer and/or death.

297.    The defective and dangerous PRODUCTS which were manufactured, produced, analyzed, tested and distributed throughout the United States without warnings of the ovarian cancer hazard caused by talc itself and/or the presence of asbestos, asbestiform fibers, and other harmful constituents in the talc, and/or not using a safer alternative to talc such as cornstarch, based on the foregoing activities, give rise to an actionable conspiracy and the concert of action arose from and was connected with Defendants' conduct in the forum State of California

298.    Defendants' liabilities arise from and relate to these contacts with the forum of the State of California.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 79**

299.   Defendants purposefully affiliated themselves with the forum of the State of California giving rise to the underlying controversy.  Such purposeful availment and activities within and related to the State of California included, but are not limited to: 1) the Defendants' contractual relationships with the entities and discussed above giving rise to the source, supply, manufacturing, production, research and testing, analyzing, processing, distribution, advertising and marketing of the PRODUCTS in the State of California and being controlled and directed from the State of California; 2) agreements between Defendants and entities, institutions and thought leader academics within State of California regarding the PRODUCTS where Defendants contractually consented to have state courts within the State of California adjudicate disputes; 3) marketing and advertising of the PRODUCTS by Defendants targeted specifically to women within the State of California as opposed to the Nation as a whole; 4) agreements and other arrangements between Defendants and hospitals and other healthcare providers specific to the State of California where, for example, expectant and post-partum mothers were provided gift baskets containing the PRODUCTS; 5) conferences, tradeshows and other promotional activities by Defendants with regard to the PRODUCTS targeted specifically to the State of California; 6) lobbying, consulting, and advisory efforts on behalf of Defendants with regard to the PRODUCTS stemming from law firms and other agents in the State of California; 7) and other actions by Defendants targeted to the State of California to be obtained through discovery and other means.  As the location from which Defendants' suit-related conduct arose out of, California has a substantial vested interest in the acts of Defendants which led to the underlying controversy.

300.   At all times herein mentioned, the Defendants and IMERYS, and each of them, had actual knowledge that each of the other Defendants and IMERYS was going to intentionally and negligently engage in the tortious misconduct and negligent acts alleged in the causes of action set forth in this complaint, including but not limited to the acts, failures to act, misrepresentations and breaches of  duties of care owed by each of the Defendants and IMERYS to purchasers and users of talc products in the United States, both in and outside the State of California, including Plaintiff.

301.   The Defendants and IMERYS, and each of them, entered into and formed an oral and/or implied agreement or joint venture with each of the other Defendants and IMERYS in California to commit the aforementioned wrongful acts in California.

302. The Defendants and IMERYS, and each of them, in concert with each other and pursuant to a common design, by express as well as tacit agreement, gave substantial assistance, encouragement and advice, both within and outside the State of California, to each and every other Defendant and IMERYS, in committing the aforementioned tortious misconduct, negligent acts, misrepresentations and breaches of duties.

303. In providing such substantial assistance, the Defendants and IMERYS, and each of them, acted with the specific intent to facilitate the acts of wrongful conduct alleged, and with knowledge that the conduct of each of the other Defendants and IMERYS constituted a breach of duties to others and would cause harm to purchasers and users of talc products in the United States, both inside and outside of the State of California, including Plaintiff.

304. The conduct of Defendants and IMERYS, and each of them, in giving such substantial assistance and encouragement in California, and their joint actions in California, were a substantial factor in causing harm to purchasers and users of talc products in the United States, both in and outside the State of California, including Plaintiff.

305. Because of their concert of action and aiding and abetting each other, each of the Defendants and IMERYS is jointly and derivatively liable for the relevant acts and misconduct each of the other engaged in within the State of California, and the resulting harm to Plaintiff.

306. Defendant JOHNSON & JOHNSON ("J&J") manufactured Johnson's baby powder from 1893 until 1979. In 1979, Johnson & Johnson Consumer Inc. F/K/A Johnson & Johnson Consumer Companies, Inc., ("Old JJCI"), a wholly owned subsidiary of Johnson & Johnson, began manufacturing the product. However, at all relevant times, and long after it turned over manufacturing and distribution of its talcum powder products to its subsidiary, JOHNSON & JOHNSON continued to be involved in the marketing and distribution of talc products by its subsidiary such that (1) JOHNSON & JOHNSON received a direct financial benefit from its activities and from the sale of the talcum products; (2) JOHNSON & JOHNSON's role was integral to the business enterprise such that the Defendant's conduct was a necessary factor in bringing the products to the initial consumer market; and (3) JOHNSON & JOHNSON had control over, or a substantial ability to influence, the manufacturing or distribution process.

307.    Moreover, at all relevant times Defendant JOHNSON & JOHNSON voluntarily involved itself into the talc products marketing process, and assumed a business relationship with its subsidiary in marketing the products, permitting the use of JOHNSON & JOHNSON's trademarks on the products along with its representations of quality and safety, in order to endorse the products and induce consumers to purchase the products in reliance upon Johnson & Johnson's name and reputation. JOHNSON & JOHNSON in effect loaned its reputation to promote and induce the sale of the talc products, even though the products were not as represented by JOHNSON & JOHNSON's endorsements and representations, thereby exposing users to unreasonable risks of harm.

308.    To the average consumer, the talc products are JOHNSON & JOHNSON's.  Old JJCI, was virtually unknown to consumers. Likewise, Defendant KENVUE is virtually unknown to the average consumer. In contrast, "Johnson & Johnson is essentially a household name in the United States. Trademarks owned by and registered to Johnson & Johnson were prominently displayed on the front and back labels, whereas Old JJCI is usually only mentioned on the back of the products *after* the trademarks of JOHNSON & JOHNSON and references to the parent company, and only on the bottom of the products' back labels. Even then, Old JJCI was only referred to as having "*distributed*" the products. The clear messages to consumers, as intended by JOHNSON & JOHNSON, were that they were buying *Johnson & Johnson* products, not those of Old JJCI, that JOHNSON & JOHNSON was making representations as to the safety and quality of the products, and that consumers could and should rely on JOHNSON & JOHNSON's longstanding reputation for quality and safety of the products, and the representations thereon.

309.    The top of the front label of the Johnson's Baby Powder product used the trademark script "*Johnson's*" at the top.  The records of the United States Patent and Trademark Office show this trademark was registered July 1, 1986, that the owner of the *Johnson's* mark is JOHNSON & JOHNSON, and that the mark was first used in 1899. According to a notice from the Trademark Office mailed February 16, 2007, the registration for the *Johnson's* mark was renewed pursuant to a combined affidavit and renewal application. On February 28, 1992 Johnson & Johnson Vice-President Roger S. Fine submitted a declaration to the Commissioner of Patents and Trademarks, stating, inter alia, that the Mark *Johnson's* (in script) "has been in continuous use in interstate commerce by Johnson & Johnson Consumer Products, Inc.,

a wholly owned subsidiary of Johnson & Johnson *whose use inures to the benefit of Johnson & Johnson* for five consecutive years from the date of registration to the present, on or in connection which each of the following goods recited in the registration: baby powder…" (Emphasis added.)

310. In addition to the Johnson's name, the front label of the product also displayed the familiar script trademark "*Johnson & Johnson*." The Trademark Electronic Search System (TESS) of the U.S. Patent and Trademark Office shows that this mark was registered July 1, 1986, and it is also owned by Johnson & Johnson Corporation. The database also shows that it was first used in commerce in 1910, and it was renewed on February 5, 2016. Within the database, this same "*Johnson & Johnson*" mark has separate registration histories for myriad consumer products, including but not limited to first aid tapes; wound dressings, contact lenses, shampoo, cotton swabs, pre-moistened wash cloths, baby bath skin cleanser, hair detangler, hair conditioner, dental floss; hand and body lotion, sports adhesive tape blister dressings, skin cream, skin oil and corn starch body powder.

311. These longstanding and well-known trademarks, which are the only trademarks on the products, are registered to and owned by JOHNSON & JOHNSON - not Old JJCI or KENVUE - and they have both been used for over a century. JJCI, in marketing talc products it manufactures, has been trading off the reputation, name and trademarks owned by its parent company. JOHNSON & JOHNSON's conduct and its trademarks were integral to the business enterprise and brought the talc products to the initial consumer market.

312. "Shower to Shower," another talcum powder product, was manufactured by Old JJCI. However, it was developed by JOHNSON & JOHNSON, which has always owned the trademark, and used the mark as early as 1966. JOHNSON & JOHNSON was the plaintiff in an action challenging a decision of the Trademark Trial and Appeal Board which had sustained the opposition of another manufacturer to registration of its trademark. These products had JOHNSON & JOHNSON's "Shower to Shower" trademark on the front of the bottle, and the trademarks of both "Johnson & Johnson Consumer Products Company," (Old JJCI's predecessor), as well as "Johnson & Johnson" on the back label.

313. JOHNSON & JOHNSON's trademarks have not apparently changed over time, but they have been used by JOHNSON & JOHNSON to make a number of differing representations about the talc products alongside its trademarks on the front and back labels. These representations, combined with the

78
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 83**

*Johnson's* and *Johnson & Johnson* trademarks, conveyed to purchasers that the talc products were safe based upon JOHNSON & JOHNSON's longstanding reputation for quality and safe consumer goods. For example, in one version of Johnson's Baby Powder, JOHNSON & JOHNSON's trademarks are displayed on the same label as a gold seal bearing the words "MEETS OUR GLOBAL SAFETY STANDARDS," surrounded by a banner proclaiming "TRUSTED BY MILLIONS OF MOMS." An earlier example of the use of JOHNSON & JOHNSON's trademarks almost thirty years ago, is a label included with the 1992 declaration to the Patent and Trademark Office, which states between the JOHNSON & JOHNSON trademarks on the front of the product: "*purest protection.*"

314. Similarly, the front of the label for Johnson's Baby Powder on Old JJCI's website represented: "*mildness clinically proven*," above JOHNSON & JOHNSON's "*Johnson's*" trademark, along with the statements "keeps skin comfortable, dry and feeling soft" and "no parabens, phthalates or dyes," above JOHNSON & JOHNSON's "*Johnson & Johnson*" trademark. The back label also includes the *Johnson's* trademark, along with the representations: "For over 125 years, JOHNSON'S(R) formulas have been specially designed for baby's unique skin. Great for kids and adults too!"; "Hypoallergenic & tested with dermatologists" and "Every JOHNSON'S® product is designed to meet or exceed the top internationally recognized regulatory standards."

315. There was no Old JJCI trademark on the baby powder products. There was no mention of Old JJCI on the front label of the product, and the only mention of Old JJCI anywhere was on the back label after the product description, contact numbers, instructions and warnings. Even then, Old JJCI was only described as having "*distributed*" the product. To all outward appearances, JOHNSON & JOHNSON was and is the manufacturer of the talc products distributed by Old JJCI, and the representations of safety and quality were and are made by JOHNSON & JOHNSON. The labels asked and induced purchasers to rely upon JOHNSON & JOHNSON's household name, as well as its long history and its exceptional reputation among consumers for quality and safety, right up through and beyond May 19, 2020, when JOHNSON & JOHNSON announced on its website that it was discontinuing the sale of all talc-based products in the United States and Canada, and through and beyond August 11, 2022, when JOHNSON & JOHNSON announced it was discontinuing the products globally in 2023, and transitioning to an "all cornstarch-based baby powder portfolio."

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 84**

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Negligence

### (Against All Defendants)

316.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

317.    Negligence is the failure to use reasonable care to prevent harm to another person.

318.    Plaintiff claims that she was harmed by Defendants' negligence. Plaintiff bought and used the talcum powder products. Plaintiff's perineal use of the talcum powder products was a substantial factor in causing her harm.

319.    Defendants designed, manufactured, supplied, inspected, tested, distributed and/or sold the talcum powder product.

320.    Title 21, Section 740.1(a) of the Code of Federal Regulations states: "The label of a cosmetic product shall bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." 21 C.F.R. § 740.1(a).

321.    Defendants violated this law.

322.    The violation was a substantial factor in bringing about the harm suffered by Plaintiff.

323.    Defendants were negligent. Defendants were negligent in designing, manufacturing, supplying, inspected, testing, distributing, and selling the talcum powder products.

324.    Defendants failed to use reasonable care to prevent harm to others, including Plaintiff.

325.    Plaintiff was harmed.

326.    Defendants' negligence was a substantial factor in causing Plaintiff's harm.

### SECOND CAUSE OF ACTION

### Negligent Failure to Warn

### (Against All Defendants)

327.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 85**

328. Plaintiff claims that Defendants were negligent by not using reasonable care to warn or instruct about the talcum powder product's dangerous condition or about facts that made the product likely to be dangerous.

329. Defendants manufactured, distributed and/or sold the product.

330. Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner;

331. Defendants knew or reasonably should have known that users would not realize the danger.

332. Defendants failed to adequately warn of the danger or instruct on the safe use of the product.

333. A reasonable manufacturer, distributor, or seller under the same or similar circumstances would have warned of the danger or instructed on the safe use of the product.

334. Plaintiff was harmed.

335. Defendants' failure to warn or instruct was a substantial factor in causing Plaintiff's harm.

336. Plaintiff also alleges that Defendants failed to provide any warning about the dangers of the talcum powder products to consumers, including Plaintiff, after it was sold.

337. Defendants manufactured, distributed and /or sold the product.

338. Defendants knew or reasonably should have known that the product was dangerous or was likely to be dangerous when used in a reasonably foreseeable manner.

339. Defendants were aware of this danger and defect both before and after the product was sold.

340. Defendants failed to recall the product or warn of the danger of the product.

341. A reasonable manufacture, distributor or seller under the same or similar circumstances would have recalled the product or provided a post-sale warning.

342. Plaintiff was harmed.

343. Defendants' failure to recall the product or provide a warning was a substantial factor in causing Plaintiff's harm.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**THIRD CAUSE OF ACTION**

**Strict Liability - Design Defect**

**(Against All Defendants)**

344. Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

345. Plaintiff claims that she was harmed by a product tested, distributed, manufactured, and/or sold by Defendants that was defectively designed.

346. Plaintiff claims the product's design was defective because the talcum powder product did not perform as safely as an ordinary consumer would have expected it to perform.

347. Defendants manufactured, distributed and/or sold the talcum powder product.

348. The talcum powder product did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

349. Plaintiff was harmed.

350. The talcum powder product's failure to perform safely was a substantial factor in causing Plaintiff's harm.

351. As an alternative to the consumer expectations test, Plaintiff also claims that the talcum powder product was defectively designed under the risk-benefit test.

352. Defendants manufactured, distributed and/or sold the product.

353. The talcum powder product's design was a substantial factor in causing harm to Plaintiff.

**FOURTH CAUSE OF ACTION**

**Strict Liability – Failure to Warn**

**(Against All Defendants)**

354. Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

355. Plaintiff claims that the talc powder products lacked sufficient warnings of the potential risks.

356. Defendants manufactured, distributed, and/or sold the talc powder products.

82

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

357.    The talc powder products had potential risks that were known or knowable in light of scientific and medical knowledge at the time of the manufacture, distribution and/or sale of the talc powder products.

358.    The potential risks presented a substantial danger when the talc powder products were used in an intended or reasonably foreseeable way.

359.    Ordinary consumers would not have recognized or known about the potential risks.

360.    Defendants failed to adequately warn of the potential risks.

361.    Plaintiff was harmed.

362.    The lack of sufficient warnings was a substantial factor in causing Plaintiff's harm.

**FIFTH CAUSE OF ACTION**

**Breach of Warranty**

**(Against All Defendants)**

363.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

364.    Plaintiff claims that she was harmed by the talcum powder product because Defendants represented, either by words or actions, that the talcum powder product was safe, but the product was not safe and was not as it was warranted to be.

365.    The talcum powder product did not have the quality that a buyer, consumer, or user would expect.

366.    Defendants were in the business of selling the talcum powder products and held themselves out as having special knowledge regarding the talcum powder products.

367.    The talcum powder products were not safe for perineal use.

368.    The talcum powder product failed to perform as safely as it was warranted to be.

369.    Plaintiff has been harmed.

370.    The failure of the talcum powder product to be as represented and warranted and to have the expected safety was a substantial factor in causing Plaintiff's harm.

## SIXTH CAUSE OF ACTION

### Fraud – Intentional Misrepresentation

### (Against All Defendants)

371.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

372.    Plaintiff claims that Defendants made a false representation that harmed her.

373.    Defendants represented to consumers, including Plaintiff, that the talcum powder products were safe.

374.    Defendants' representation was false.

375.    Defendants knew that the representation was false when it was made, or made the representation recklessly and without regard for its truth.

376.    Defendants intended that consumers, including Plaintiff, rely on the representation.

377.    Plaintiff reasonably relied on Defendants' representation.

378.    Plaintiff was harmed.

379.    Plaintiff's reliance on Defendants' representation was a substantial factor in causing her harm.  Plaintiff's perineal use of talc was a substantial factor in causing her harm.

380.    Plaintiff would not have used the talcum powder products had she known the truth about the dangers and risks posed by the talcum powder products which Defendants misrepresented and concealed.

## SEVENTH CAUSE OF ACTION

### Fraud – Concealment

### (Against All Defendants)

381.    Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

382.    Plaintiff claims that she was harmed because Defendants concealed certain information about the dangers and risks of the talcum powder products.

383.    Defendants had a duty to disclose material information regarding the safety hazards, dangers and risks posed by the talcum powder products to consumers, including Plaintiff.

384. Defendants intentionally failed to disclose certain facts to the public and consumers, including Plaintiff.

385. In addition, Defendants disclosed some facts, but intentionally failed to disclose other facts, making what disclosures they did make deceptive.

386. Defendants intentionally failed to disclose certain facts that were known only to them and their agents, and that consumers, including Plaintiff, could not have discovered.

387. By virtue of their conduct, Defendants prevented the public and consumers, including Plaintiff, from discovering certain facts regarding the safety hazards, dangers and risks posed by perineal use of the talcum powder products which Defendants concealed.

388. Plaintiff did not know of the concealed facts.

389. Defendants intended to deceive consumers, including Plaintiff, by concealing the facts.

390. Had the omitted information been disclosed, Plaintiff reasonably would have behaved differently. She would not have used the talcum powder products which ultimately caused the harm she has suffered.

391. Plaintiff was harmed.

392. Defendants' concealment was a substantial factor in causing Plaintiff's harm.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants)

393. Plaintiff hereby incorporates each of the paragraphs of this Complaint as if fully set forth herein.

394. Plaintiff was harmed because Defendants negligently misrepresented that the talcum powder products were safe.

395. Defendants represented to consumers, including Plaintiff, that the talcum powder products were safe.

396. Defendants' representation was not true.

397. Defendants had no reasonable grounds for believing the representation was true when it was made.

398. Defendants intended that consumers, including Plaintiff, believe and rely on the representation that the talcum powder products were safe.

399. Plaintiff reasonably relied on Defendants' representation and believed that the talcum powder products were safe.

400. Plaintiff would not have used Defendants' talcum powder products had she known the truth.

401. Plaintiff was harmed.

402. Plaintiff's reliance on Defendants' representation that the talcum powder products were safe was a substantial factor in causing her harm.

### TOLLING STATUTES OF LIMITATIONS AND PUNITIVE DAMAGES

403. Plaintiff hereby incorporates by reference all other paragraphs of this Complaint.

404. Plaintiff suffered illnesses that have latency periods and do not arise until many years after exposure. The illnesses did not distinctly manifest as having been caused by the PRODUCTS until Plaintiff was made aware that the ovarian cancer could be caused by use of the PRODUCTS. Consequently, the discovery rule applies to this case and the statute of limitations has been tolled until the day that Plaintiff knew or had reason to know that ovarian cancer was linked to the use of the PRODUCTS.

405. Furthermore, the running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and conduct. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with the talcum powder contained within the PRODUCTS.

406. As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know, or could not have reasonably learned through reasonable diligence, that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

407. Furthermore, Defendants are estopped from relying on any statute of limitations because of their concealment of the truth, quality and nature of the PRODUCTS. Defendants were under a duty to disclose the true character, quality and nature of PRODUCTS because this was non-public information which the Defendants had and continue to have in their exclusive control, and because the Defendants knew that this information was not available to Plaintiff.

408.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants had the ability to and did spend enormous amounts of money in furtherance of their purpose of marketing and promoting profitable PRODUCTS, notwithstanding the known or reasonably known risks. Plaintiff and medical professionals could not have afforded and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and were forced to rely on Defendants' representations.

409.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, in representations to the Plaintiff and the public in general, Defendants also fraudulently concealed and intentionally omitted the following material information:

- that the PRODUCTS were not as safe as other products available;
- that the PRODUCTS were dangerous; and
- that the PRODUCTS were defectively and negligently designed and had defective, inadequate, and insufficient warnings and instructions.

410.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants were under a duty to disclose to Plaintiff, and the public in general, the defective nature of the PRODUCTS.

411.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made the misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS with the intention and specific desire to induce the consumers, including the Plaintiff, to rely on such misrepresentations in selecting, purchasing and using the PRODUCTS.

412.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants made these misrepresentations and actively concealed information concerning the safety and efficacy of the PRODUCTS in the labeling, advertising, promotional material or other marketing efforts.

413.    Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, these representations, and others made by Defendants, were false when made and/or were

87
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 92**

made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

414. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealments by Defendants were perpetuated directly and indirectly by Defendants, their sales representative, employees, distributors, agents, marketers and detail persons.

415. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, at the time the representations were made, Plaintiff did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the PRODUCTS. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations of Defendants, nor would Plaintiffs with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

416. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants knew that Plaintiff, and the public in general, had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the PRODUCTS, as set forth herein.

417. Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the PRODUCTS, Plaintiff would not have purchased, used, or relied on Defendants' PRODUCTS.

418. Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, including Plaintiff.

419. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the information distributed to the public and Plaintiff by Defendants included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the PRODUCTS.

420. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants intentionally made material misrepresentations to the medical community and

public, including Plaintiff, regarding the safety of the PRODUCTS, specifically that the PRODUCTS did not have dangerous and/or serious adverse health safety concerns, and that the PRODUCTS were as safe as other products.

421. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' intent and purpose in making these misrepresentations was to deceive the Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff, to falsely assure them of the quality and fitness for use of the PRODUCTS; and induce Plaintiff and the public to use the PRODUCTS.

422. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the PRODUCTS to the public at large, for the purpose of influencing the sales of PRODUCTS known to be dangerous and defective, and/or not as safe as other alternatives.

423. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants knew that the PRODUCTS were not safe for consumers.

424. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, the misrepresentations and active concealment by Defendants constitute a continuing tort. Indeed, Defendants continue to misrepresent the potential risks and serious side effects associated with the use of the PRODUCTS.

425. Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, as a result of the Defendants' advertising and marketing efforts, and representations, the PRODUCTS are and continue to be pervasively manufactured and used in California and throughout the United States.

426. Plaintiff is informed and believes, and based thereon alleges, at all relevant times alleged herein, the acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the PRODUCTS and for the primary purpose of increasing Defendant's profits from the sale and distribution of the PRODUCTS. Defendants' outrageous and unconscionable

conduct warrants an award of exemplary and punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

427.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, prior to the manufacturing, sale and distribution of the PRODUCTS, Defendants, and each of them, knew that the PRODUCTS were in a defective condition as previously alleged herein and knew that those who used the PRODUCTS would experience and did experience severe injuries. Further, Defendants and each of them through its officers, directors, managers, and agents, had knowledge that the PRODUCTS presented a substantial and unreasonable risk of harm to the public, including Plaintiff and, as such, consumers of the PRODUCTS were unreasonably subjected to risk of injury.

428.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, despite such knowledge, Defendants, and each of them, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in the PRODUCTS and failed to warn the public, including the Plaintiff, of the extreme risk of injury occasioned by said defects inherent in the PRODUCTS. Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, distribution and marketing of the PRODUCTS knowing that the public, including Plaintiffs, would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits.

429.   Plaintiff is informed and believes, and based thereon alleges that, at all relevant times alleged herein, Defendants' conduct was despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for safety, entitling Plaintiff to exemplary damages under California Civil Code section 3294.

430.   Plaintiff filed this lawsuit within the applicable limitations period of first suspecting that the PRODUCTS were the cause of any appreciable harm sustained by Plaintiff, within the applicable limitations period of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering the injuries. Plaintiff could not, by the exercise of reasonable diligence, have discovered any wrongdoing and could not have discovered the causes of the injuries at an earlier time because the injuries occurred without initial perceptible trauma or harm and, when the injuries were discovered, the causes were not immediately known.  Plaintiff did not suspect, nor did Plaintiff have

reason to suspect, that wrongdoing had caused the injuries until recently. Plaintiff filed the original action within the applicable limitations period of discovering the causes of action and identities of Defendants.

431.    Plaintiff had no knowledge of the defects in the PRODUCTS or of the wrongful conduct of Defendants as set forth herein, nor did Plaintiff have access to information regarding other injuries and complaints in the possession of Defendants. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public that the PRODUCTS are safe and free from defects, and Defendants fraudulently concealed information to allow Plaintiff to discover a potential cause of action sooner.

432.    Plaintiff has reviewed her potential legal claims and causes of action against the Defendants and intentionally chooses only to pursue claims based on state-law. Any reference to any federal agency, regulation or rule is stated solely as background information and does not raise a federal question. Plaintiff chooses to only pursue claims based on state law and is not making any claims that raise federal questions.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment against Defendants JOHNSON & JOHNSON, KENVUE INC, RED RIVER TALC LLC, Defendants DOES 1 through 100, inclusive, and the Other Defendants named by Plaintiff in the Notice of Adoption of Master Complaint, jointly and severally, and as appropriate to each cause of action alleged and the standing of Plaintiff as follows:

1.    Past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

2.    Past and future economic and special damages according to proof at the time of trial;

3.    Loss of earnings and impaired earning capacity according to proof at the time of trial;

4.    Medical expenses, past and future, according to proof at the time of trial;

5.    Punitive or exemplary damages according to proof at the time of trial;

6.    Attorney's fees;

7.    For costs of suit incurred herein;

8.    For pre-judgment interest as provided by law; and

///
///
///

9.     For such other and further relief as the Court may deem just and proper.

Dated:   February 4, 2026                    Respectfully submitted,

**WISNER BAUM, LLP**

By:   _____
Ari S. Friedman, Esq.
afriedman@wisnerbaum.com
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 820-6227
Fax: (310) 820-7444

*Attorney for Plaintiff*

92
COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 97**

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all counts in this Complaint.

Dated:   February 4, 2026                    Respectfully submitted,

**WISNER BAUM, LLP**

By:  _____

Ari S. Friedman, Esq.
afriedman@wisnerbaum.com
11111 Santa Monica Blvd., Suite 1750
Los Angeles, CA 90025
Telephone: (310) 820-6227
Fax: (310) 820-7444

*Attorney for Plaintiff*

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL
**Exhibit A - Page 98**

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

JOHNSON & JOHNSON, a New Jersey corporation doing business in California; Additional Parties Attachment form is attached.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

HELEN JEAN PARKER, an Individual

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/04/2026 2:44 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Los Angeles Superior Court

Spring Street Courthouse, 312 N Spring Street, Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso):*  26STCV04029

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Wisner Baum, LLP, 11111 Santa Monica Blvd., Ste. 1750, Los Angeles, CA 90025, Tel: (310) 207-3233

DATE:
*(Fecha)*  02/04/2026

Clerk, by   David W. Slayton, Executive Officer/Clerk of Court  , Deputy
*(Secretario)*  _____ J. Nunez _____  *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**Exhibit A - Page 99**

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| PARKER v. JOHNSON & JOHNSON, et al. | 26STCV04029 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

KENVUE INC., a Delaware corporation doing business in California individually and as successor-in-interest to Old Johnson & Johnson Consumer Inc. and New Johnson & Johnson Consumer Inc.; RED RIVER TALC LLC; a Texas limited liability company, individually and as successor-in-interest to LLT Management LLC and Old Johnson & Johnson Consumer Inc.; JOHN DOE CORPORATIONS 1 through 100, inclusive;

Page ___1___ of ___1___

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**Exhibit A - Page 100**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: 256463 | FOR COURT USE ONLY |
|---|---|---|

NAME: Ari S. Friedman, Esq.

FIRM NAME: WISNER BAUM, LLP

STREET ADDRESS: 11111 Santa Monica Boulevard, Suite 1750

CITY: Los Angeles        STATE: CA    ZIP CODE: 90025

TELEPHONE NO.: (310) 207-3233    FAX NO.: (310) 820-7444

EMAIL ADDRESS: afriedman@wisnerbaum.com

ATTORNEY FOR (name): Plaintiff, HELEN JEAN PARKER

**FOR COURT USE ONLY**

*Electronically FILED by
Superior Court of California,
County of Los Angeles
2/04/2026 2:44 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Nunez, Deputy Clerk*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES

STREET ADDRESS: 312 N Spring Street

MAILING ADDRESS:

CITY AND ZIP CODE: Los Angeles 90012

BRANCH NAME: Spring Street Courthouse

CASE NAME:
 PARKER  v. JOHNSON & JOHNSON, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] Unlimited  [ ] Limited | [ ] Counter  [ ] Joinder | 26STCV04029 |
| (Amount demanded exceeds $35,000) | (Amount demanded is $35,000 or less) | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE:  DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Asbestos**
[ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[x] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/Unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Employment Development Department (EDD)**
[ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Comprehensive groundwater adjudication (47)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition (not specified above) (43)

| Judicial Council of California, courts.ca.gov Rev. January 1, 2026, Mandatory Form Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740 Cal. Stds. Jud. Admin., std. 3.10 | **Civil Case Cover Sheet** | CM-010, Page 1 of 3 → |

**Exhibit A - Page 101**

CM-010

2.  Is this case complex under rule 3.400 of the California Rules of Court?    ☒ Yes    ☐ No

If the case is complex, mark the factors requiring exceptional judicial management:

a.  ☒  Large number of separately represented parties

b.  ☒  Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve

c.  ☒  Substantial amount of documentary evidence

d.  ☒  Large number of witnesses

e.  ☒  Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court

f.  ☒  Substantial postjudgment judicial supervision

3.  Remedies sought *(check all that apply):*

a.  ☒  monetary

b.  ☐  nonmonetary; declaratory or injunctive relief

c.  ☒  punitive

4.  Number of causes of action *(specify):* Eight (8)

5.  Is this case a class action suit?    ☐ Yes    ☒ No

6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: February 4, 2026

Ari S. Friedman, Esq.
_____
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

---

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.

- File this cover sheet in addition to any cover sheet required by local court rule.

- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.

- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

---

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment.  The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

---

**Exhibit A - Page 102**

CM-010

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/
Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Asbestos**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/Wrongful Death
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Product Liability *(not asbestos or toxic/ environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collections Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition re Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals
**Employment Development Department (EDD)**
EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Comprehensive Groundwater Adjudication (47)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister-State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
Mechanic's Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition

Rev. January 1, 2026    **Civil Case Cover Sheet**    **CM-010**, Page 3 of 3

**Exhibit A - Page 103**

| SHORT TITLE | CASE NUMBER |
|---|---|
| PARKER v. JOHNSON & JOHNSON, et al. | 26STCV04029 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1.   Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7.   Location where petitioner resides. |
| 2.   Permissive filing in Central District. | 8.   Location wherein defendant/respondent functions wholly. |
| 3.   Location where cause of action arose. | 9.   Location where one or more of the parties reside. |
| 4.   Location where bodily injury, death or damage occurred. | 10.   Location of Labor Commissioner Office. |
| 5.   Location where performance required, or defendant resides. | 11.   Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6.    Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| | | |
|---|---|---|
| LASC CIV 109 Rev. 01/23<br>For Mandatory Use | CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION | LASC Local Rule 2.3 |

**Exhibit A - Page 104**

| SHORT TITLE | CASE NUMBER |
|---|---|
| PARKER v. JOHNSON & JOHNSON, et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☑ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, ④ |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| PARKER v. JOHNSON & JOHNSON, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

LASC CIV 109 Rev. 01/23
For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

Exhibit A - Page 106

| SHORT TITLE<br>PARKER v. JOHNSON & JOHNSON, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 01/23
For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

**Exhibit A - Page 107**

| SHORT TITLE<br>PARKER v. JOHNSON & JOHNSON, et al. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☐ 2. ☐ 3. ☑ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | | | ADDRESS:<br><br>737 S Kingsley Dr |
|---|---|---|---|
| CITY:<br>Los Angeles | STATE:<br>CA | ZIP CODE:<br>90012 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the __Central__ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: __02/04/2026__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.



*Superior Court of California, County of Los Angeles*
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**
Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
RESOURCE LIST DISCLAIMER: The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*